UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Elena Katz *et al.*

    v.                                    Civil No. 10-cv-410-JL
                                          Opinion No. 2013 DNH 037
Brian McVeigh *et al.*


**MEMORANDUM ORDER**

The plaintiffs, Elena Katz and Arnold Grodman,[1] have brought
a 32-count amended complaint against 24 separately named
defendants, principally alleging violations of the United States
Constitution and state law.  The plaintiffs' claims arise out of
their loss of legal custody of their daughter, Eleonora, to the
New Hampshire Department of Children, Youth and Families ("DCYF")
in November 2009, followed by efforts by various law enforcement
officials to secure physical custody of Eleanora and, ultimately,
her placement at a privately run residential rehabilitation
facility.  This court has subject-matter jurisdiction under 28
U.S.C. §§ 1331 (federal question) and 1367 (supplemental
jurisdiction), except to the extent that the plaintiffs' claims

_____

[1]Stuart Grodman, Arnold Grodman's brother, is also named as
a plaintiff in the amended complaint, but was not involved in the
vast majority of the events giving rise to the litigation.  For
ease of reference, then, the court will use "plaintiffs" to refer
to Elena Katz and Arnold Grodman, "Grodman" to refer to Arnold
Grodman, and "Stuart Grodman" to refer to Stuart Grodman.

seek review of final state-court judgments or other relief this court is not empowered to grant.  See infra Part III.A.2-3.

The defendants have all moved either to dismiss the plaintiffs' amended complaint for failure to state a claim, see Fed. R. Civ. P. 12(b)(6), or for judgment on the pleadings, see Fed. R. Civ. P. 12(c).  For the reasons explained in detail below, those motions are granted.  The amended complaint characterizes all of the efforts to remove Eleonora from the plaintiffs' custody, and place her in state custody, as part of a conspiracy to ensure the state's receipt of federal monies on her behalf--or as retaliation for complaints the plaintiffs made several years earlier about their daughter's experiences in the Timberlane Regional School District.  Those claims are not plausibly alleged, particularly against defendants (such as the many law enforcement officers and agencies named by this lawsuit) who had nothing to gain from the state's receipt of those monies or any reason to know or care of the plaintiffs' gripes against Timberlane.  Insofar as the amended complaint plausibly states a retaliation claim against Timberlane (or its one employee who is named as a defendant), that claim is based on conduct that occurred outside of the limitations period.

The plaintiffs also claim violations of their rights to family integrity under the due process clause of the Fourteenth

Amendment, and to be free from arrest and detention without probable cause under the Fourth Amendment.  Insofar as the plaintiffs' substantive due process claims do not impermissibly seek review of the state courts' decisions awarding custody, and later guardianship, of Eleonora to DCYF, they are barred by qualified immunity, because no reasonable official in the position of any of the defendants involved in those proceedings would have believed he was violating the plaintiffs' constitutional rights, as opposed to pursuing the state's legitimate interest in protecting the health and welfare of its children.  The plaintiffs also fail to state a substantive due process claim arising out of the allegedly excessive medication administered to Eleonora during her stay at the rehabilitation facility, because neither the facility nor her doctor there are state actors subject to constitutional restrictions.

Qualified immunity also bars the plaintiffs' claims arising out of their arrest and detention, because, to the limited extent any of the named defendants even participated in those deprivations, they were amply supported by probable cause that the plaintiffs had knowingly removed Eleonora from the state to interfere with the DCYF's right to custody of her, which is a felony under New Hampshire law.  The plaintiffs' other claims against the law enforcement officers (e.g., for allegedly

requesting Katz's detention without bail) also do not state a violation of any clearly established constitutional right and are therefore barred by qualified immunity as well.

As to the other claims set forth in the amended complaint: (1) many assert the rights of Eleonora, so the plaintiffs cannot bring those claims here without an attorney, which they have been unable to secure since their counsel was granted leave to withdraw; (2) others, including a claim that Boston Police officers made a warrantless entry into Stuart Grodman's apartment, are barred by the statute of limitations; and (3) still others, including state-law negligence and defamation claims, are pled wholly in conclusory terms (to the limited extent they do not rely on privileged statements and conduct). Accordingly, the amended complaint is dismissed in its entirety.

## I.  Applicable legal standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  In ruling on such a motion, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the

plaintiff's favor.  See, e.g., Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).  This indulgence does not extend, however, to "statements in the complaint that merely offer legal conclusions couched as fact or threadbare recitals of the elements of a cause of action," which are disregarded.  Ocasio-Hernandez v. Fortuno-Benet, 640 F.3d 1, 12 (1st Cir. 2011) (quotation marks, bracketing, and ellipse omitted).

A court ruling on a motion to dismiss under Rule 12(b)(6) may "consider not only the complaint but also facts extractable from documentation annexed to or incorporated by reference in the complaint and matters susceptible to judicial notice." Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35 (1st Cir. 2009) (quotation marks omitted).  This includes matters of public record, such as "documents from prior state court adjudications." Giragosian v. Ryan, 547 F.3d 59, 66 (1st Cir. 2008) (quotation marks omitted). Despite the plaintiffs' objection, then, the court can consider the records of their prior proceedings in ruling on the motions to dismiss.[2]  See id.  To the extent the plaintiffs' allegations of what happened in those proceedings are at odds with the

---

[2]Indeed, while the plaintiffs complain that the defendants have submitted only those records that support their position "without regard to context, subsequent court proceedings, appeals, etc." the plaintiffs could have responded by submitting whatever records they claim the defendants omitted.  See Giragosian, 547 F.3d at 66.  The plaintiffs did not do so.

records, moreover, the court is not required to accept the plaintiffs' version.  See Rederford, 589 F.3d at 35 n.4 (noting that, even in ruling on motions to dismiss, "courts need not accept facts which have since been conclusively contradicted").[3]

Furthermore, as the defendants point out, at least some of the findings and rulings reached by the courts in those prior proceedings are binding on Katz or Grodman by virtue of the doctrine of collateral estoppel.  "Under federal law, a state court judgment receives the same preclusive effect as it would receive under the law of the state in which it was rendered." Dillon v. Select Portfolio Servicing, 630 F.3d 75, 80 (1st Cir. 2011).  The New Hampshire doctrine of collateral estoppel "bars a party to a prior action from relitigating any issue or fact actually litigated and determined in the prior action" so long as "(1) the issue subject to estoppel [is] identical in each action; (2) the first action [] resolved the issue finally on the merits; and (3) the party to be estopped [] appeared as a party in the first action." In re Michael E., 162 N.H. 520, 523-24 (2011).

At a minimum, then, the plaintiffs are collaterally estopped from relitigating the Family Division's decision granting DCYF

_____

[3]All of the foregoing standards likewise apply to a motion for judgment on the pleadings under Rule 12(c).  See Gray v. Evercore Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008).

guardianship over Eleonora until her eighteenth birthday.  See infra Part II.A.5.b.  As described in more detail below, that guardianship action (1) involved an issue identical to one of the many the plaintiffs have raised here, see infra Part III.C.1.b, i.e., whether awarding guardianship to DCYF was in Eleonora's best interests, see N.H. Rev. Stat. Ann. § 463:8, III(a), (2) resolved that issue on the merits, and finally, see id. § 567-A:4 ("findings of fact of the judge of probate are final"),[4] and (3) involved both of the plaintiffs here.

The defendants argue that other decisions against the plaintiffs, in both this court and the state courts, are also entitled to collateral estoppel effect here.  This court need not, and does not, reach those arguments.  As just discussed, however, this court has taken judicial notice of what happened in these other proceedings (e.g., whether a filing sought ex parte relief, or whether a warrant issued), notwithstanding the plaintiffs' contrary versions of some of those events.

---

[4]Although proceedings for the guardianship of the person of a minor are now conducted in the Family Division, and no longer in the Probate Division, see N.H. Rev. Stat. Ann. § 490-D:2, VIII, the New Hampshire Supreme Court has applied this statute in reviewing a guardianship order by the Family Division, see In re Matthew L., ___ N.H. ___, 58 A.3d 684, 686 (2012).

II.  **Background**[5]

A.  **Factual history**

1.  **Plaintiffs' disputes with Timberlane**

   a.  **Plaintiffs' protests and Timberlane's alleged
      retaliation**

After home-schooling Eleonora for a period, the plaintiffs
enrolled her in the Timberlane Regional School District, a New
Hampshire public school system, in November 2002.  At that time,
Eleonora was 12 years old and had been diagnosed with both
juvenile diabetes and a non-verbal learning disability.  By
January 2003, Timberlane had put in place--with the plaintiffs'
approval--an individualized education plan ("IEP") identifying
her as a child with a disability, and providing for "numerous
modifications to the regular educational curriculum," under the
Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et
seq.  Mr. G v. Timberlane Sch. Dist., 2007 DNH 002, 3-4
(rejecting plaintiffs' claims that, inter alia, this IEP violated
the IDEA) (Barbadoro, J.), aff'd without opinion, No. 07-1279
(1st Cir. June 12, 2008).

_____

    [5]In quoting from the amended complaint and the plaintiffs'
objection to the motions to dismiss, the court has taken the
liberty of correcting spelling and grammatical errors, which are
prevalent throughout those documents (in spite of the fact that
they were drafted by counsel before he withdrew).

The plaintiffs allege that, in April 2004, they "became frustrated with the unwillingness and/or inability of [Timberlane] to support [the] IEP, and organized a public demonstration protesting [Timberlane's] policies." The plaintiffs also "placed a small cardboard sign" on Elenora's backpack stating "slogans" expressing disapproval with her education. Katz filed complaints over Eleonora's treatment by Timberlane personnel with "various state agencies that oversee the conduct of [] Timberlane and its employees."

The plaintiffs allege that, in retaliation for these and other efforts on their part "to legally advocate for appropriate special education" for Eleonora, Timberlane officials, including defendant Edwina Lovett, "conspired to develop and implement a plan for keeping [the plaintiffs] on the defensive." The plaintiffs charge that this conspiracy--which also included defendant Brian McVeigh, a DCYF employee, and "other [Timberlane] officials whose identities are not yet known"--"decided to make reports of abuse and or neglect against [the plaintiffs] until [Eleonora] was in state custody." The plaintiffs further charge that Lovett "has been instrumental in making a steady stream of provably false allegations against [them] to ensure that [Eleonora] is kept in state custody so that [Timberlane] can continue receiving financial benefits." The plaintiffs allege

9

that, prior to April 2006, Lovett made three complaints to DCYF that they were neglecting Eleonora, only to have DCYF determine that each was unfounded.

### b.   Order for placement at Brattleboro Retreat

In the meantime, the plaintiffs' disputes with Timberlane over Eleonora's education continued in this court, as well as at due process hearings before the New Hampshire Department of Education.  Eventually, in March 2006, a hearing officer there found that, while attending a private educational program, Eleonora had "attempted to harm herself by pulling a charm off her charm bracelet and putting it in her mouth saying that she 'needed to choke on this tonight and die.'"  In re Eleonora G., IDPH-FY-06-10-121 (N.H. Dep't Educ. Mar. 24, 2006), slip op. at 4.  The hearing officer also found that Eleonora had been "experiencing psychotic symptoms," including "auditory and visual hallucinations, scattered thoughts, pressured speech, and difficulty staying on one topic," id. at 5, during the private educational placement, id. at 8.

Nevertheless, the hearing officer found, the plaintiffs had "never advised [Timberlane] that Eleonora had an active psychiatric disorder," id. at 11, and had "not granted their written consent to reevaluate her" for that or other potential handicaps so that Timberlane could revise her IEP, id. at 6.  The

10

plaintiffs also demonstrated an "apparent inability to manage Eleonora's diabetes" during the private educational placement, "consistently provid[ing] [her] with sweet foods" despite her doctor's contrary orders.  Id. at 8.  Her blood sugar levels over that period "were consistently in excess" of the "target range," often by a multiple of two or more.  Id. at 7.

Accordingly, the hearing officer ruled, "[t]he unique circumstances posited in this case warrant Eleonora's placement in an interim educational alternative placement, such as the Brattleboro Retreat, for the purposes of conducting a comprehensive assessment."  Id. at 14-15.  In fact, the hearing officer directed the plaintiffs to "apply for their daughter's admission to the Brattleboro Retreat" within five business days, "and immediately admit her for assessment and treatment if and when approved."  Id. at 17.  The plaintiffs did not properly appeal this order.[6]  Nevertheless, they complain here that having

---

[6]The plaintiffs attempted to challenge the hearing officer's March 2006 decision through a motion for preliminary injunction they filed in Mr. G, supra.  See Mr. G v. Timberlane Reg'l Sch. Dist., No. 04-cv-188 (D.N.H. May 3, 2006), rep't & rec. adopted (D.N.H. June 18, 2006), appeal dismissed, No. 06-2396 (1st Cir. Feb. 7, 2007).  In recommending denial of that motion, Magistrate Judge Muirhead ruled, among other things, that he lacked jurisdiction to hear a challenge to that decision as part of the Mr. G action, id. at 18-19, noting Katz's contention that she had appealed the hearing officer's March 2006 decision through another action, id. at 15.  That action, however, was subsequently dismissed because Katz had not exhausted her

Eleonora "committed to an acute care psychiatric facility" went "against the advice of her treating physician" and was "illegal."

## 2.  State court neglect and dispositional proceedings

### a.  Neglect proceedings

#### i.  Family Division

In April 2006, DCYF filed a neglect petition against each of the plaintiffs in the then-Brentwood Family Division of the New Hampshire state courts.  In re Grodman, Nos. 2006-118, 2006-110 (N.H. Family Div. Apr. 11, 2006).  The petitions alleged, among other things, that, while Eleonora had not attended school since her suicide attempt in February 2006, the plaintiffs had not contacted Brattleboro Retreat as ordered by the hearing officer, nor had they enrolled Eleanora at "any similarly equipped facility or combination of facilities."  The petitions further alleged that, absent judicial intervention, Eleanora's health would "remain at risk to suffer serious impairment due to her

---

administrative remedies.  See Katz v. Timberlane Reg'l Sch. Dist., No. 06-cv-149 (D.N.H. July 19, 2006), rep't & rec. adopted (D.N.H. Aug. 10, 2006), appeal dismissed, No. 06-2288 (1st Cir. Feb. 5, 2007).  In any event, this court does not accord collateral estoppel effect to the hearing officer's findings, see Part I, supra, and has taken judicial notice of his decision (which the plaintiffs themselves discuss in their amended complaint) solely for background purposes.  As discussed below, any claims here challenging the decision, or any defendant's role in procuring it, are barred by the statute of limitations.  See infra note 11 and Part III.B.2.b.

parents' ongoing refusal to follow medical/educational professionals' recommendations and orders."

Following a hearing, which the plaintiffs attended, the Family Division made a preliminary finding that both of the plaintiffs had neglected Eleonora, reasoning that her "health is very likely to suffer serious impairment due to [the plaintiffs'] lack of proper parental care or control." In re Grodman, Nos. 2006-118, 2006-110 (N.H. Family Div. Apr. 18, 2006).  While the Family Court awarded legal supervision of Eleonora to DCYF, she was permitted to remain in the plaintiffs' physical custody, though they were ordered to "comply with all orders of the New Hampshire Department of Education," id., including, presumably, the order to apply for Eleonora's admission to the Brattleboro Retreat.  The Family Court also joined Timberlane as a party for the purpose of "[p]roviding and paying for any educational needs." Id.

Around this time, the plaintiffs allege, defendant Lin Roy was appointed as Eleonora's guardian ad litem.  The plaintiffs further allege that Eleonora "was forcibly removed from her home and placed in" the Brattleboro Retreat (though they do not say when or by whom), where she remained for 29 days.  The plaintiffs allege that Eleonora was then placed at the Philbrook Center, a state residential facility, where she remained for 56 days.

13

Eleonora was returned to the physical custody of her parents in October 2006, when, they allege, they began home-schooling her, having "waived all public school services."  The plaintiffs allege that, after they did so, unspecified "defendants continued to smear [the plaintiffs], calling them mentally ill, obstructionist and hostile, among other things."  The plaintiffs further allege that, even though "they clearly expressed to DCYF . . . that [they] did not want to have any personal contact with defendant Brian McVeigh" as early as January 2006, he "continued to contact [them] at the Grodman home, including monthly visits," through November 2007.

### ii.  Superior Court

In the meantime, Katz appealed the Family Court's finding of neglect against her to the Rockingham County Superior Court, which conducted a de novo hearing beginning on a day in May 2007 and concluding over three days in August 2007.  See In re Grodman, No. 06-J-011 (N.H. Super. Ct. Sept. 13, 2007).  Katz attended and called at least one witness.  After the hearing, the Superior Court concluded that "from January, 2006 through April 2006, the [plaintiffs] neglected Eleonora both educationally and with respect to proper diabetes management."  Id. at 1.

The Superior Court found, among other things, that the plaintiffs "consistently mismanaged their daughter's diabetes

such that many blood glucose levels were dangerously high . . . .
Instead of working with the providers to manage Eleonora's
diabetes, the [plaintiffs] regularly requested documentation and
letters from the providers for use in litigation." Id. at 4.
The Superior Court found that the plaintiffs "appear more
interested in litigation and avoiding personal accountability for
their child's care than they are about appropriately acting in
their child's best interests." Id. at 5.  The Superior Court
also found that, "[r]egardless of whether, in hindsight, it was
ultimately appropriate to enroll Eleonora in Brattleboro Retreat,
. . . the [plaintiffs], during the time period in question,
refused to work collaboratively with [Timberlane] in addressing
Eleonora's serious psychiatric needs." Id. at 3-4.

   b.  **Dispositional proceedings**

   After entering the neglect finding, the Superior Court held
a dispositional hearing on November 30, 2007.[7]  In re Grodman,

---

[7]Under New Hampshire law, "[i]f [a] court finds that a child
is abused or neglected, the court may order" one of several
"dispositions," including that "[l]egal custody may be
transferred to a child placing agency." N.H. Rev. Stat. Ann.
§ 169-C:19, III(a).  The court may also "set forth conditions of
behavior by a parent," including to "[p]ermit a parent . . . to
visit supervised or otherwise, or have contact with the child at
stated periods and under such conditions as the court may order,"
and to "[a]bstain from harmful conduct with respect to the
child." Id. § 169-C:19, II(a)(2).  And "[t]he court may order
any . . . child to undergo individual or family therapy, or
medical treatment." Id. § 169-C:19, IV .

No. 06-J-011 (N.H. Super. Ct. November 30, 2007).  Both the
plaintiffs, as well as a guardian ad litem representing Eleonora,
Gary Paradis, attended the hearing.

At the conclusion of the hearing, the Superior Court awarded
DCYF legal custody of Eleonora, who was "to be placed in an out-
of-home placement" at Crotched Mountain, a privately run
residential school and rehabilitation facility, "for education
[and] evaluations for current medical and pyschiatric/
psychological needs."  The Superior Court found that keeping
Eleonora in the plaintiffs' home was contrary to her welfare
because "[a]t this time, DCYF is not privy to Eleonora's medical
and psychiatric treatment and her progress, and holds no
information about [her] homeschooling," since the plaintiffs had
"refused to discuss Eleonora's progress or needs" with DCYF.

While the Superior Court granted the plaintiffs visitation
rights, it required that "[a]ll visits between the [plaintiffs]
and Eleonora while [she] is attending Crotched Mountain School
shall take place off campus and shall be supervised by a parent
aide."  The order further prohibited the plaintiffs from
providing Eleonora with food or drink during their visits, or
recording them.  The plaintiffs allege that these restrictions
came about through the concerted efforts of Timberlane personnel
and Crotched Mountain's chief executive, defendant Don Shumway.

16

They also allege that "[t]hese restrictions later prevented any contact between [Eleonora] and [Katz] for a period of two and a half years," but the Superior Court's dispositional order nowhere contains such a restriction:  again, it granted visitation rights to both Katz and Grodman.

The Superior Court further ordered that "DCYF shall have direct access to all of Eleonora's medical, educational, psychological and behavioral providers, including access to all [their] records," specifying that the plaintiffs "shall sign all necessary releases.  Their failure to do so may result in a finding of contempt of Court."

In explaining its decision, the Superior Court relied on Katz's "obvious inappropriate behavior in dealing with all authorities and treatment providers" and her "refusal to provide information about Eleonora's treatment and educational status," which had "rendered any award of legal oversight to [DCYF], short of full legal custody, completely ineffectual."  The Superior Court also reasoned that, "[i]n light of the severity of Eleonora's diabetes, her need for psychiatric and educational services, and in light of [Katz's] refusal to address her own mental health needs," there was "little choice but to" grant DCYF's request for legal custody of Eleonora and her placement at Crotched Mountain.

17

### c.    Supreme Court

The plaintiffs appealed the Superior Court's dispositional order, as well as the underlying finding of neglect, to the New Hampshire Supreme Court, which "affirm[ed] the orders as they apply to Katz, and vacate[d] and remand[ed] as they apply to Grodman." In re Eleonora G., No. 2007-0924 (N.H. July 8, 2009) (unpublished disposition).  The Supreme Court upheld the Superior Court's finding that "Katz's actions and/or inactions caused [Eleonora's] diabetes to be poorly managed and that serious consequences to her health were likely to occur." Id. at 2.  But the Supreme Court agreed with Grodman that the Superior Court had erred in "failing to treat him as party" because it had mistakenly never docketed his appeal of the Family Division's neglect finding. Id. at 3.  So the Supreme Court vacated the finding of neglect against Grodman and remanded to the Superior Court for further proceedings, id., which, so far as the record before this court indicates, never took place.

### 3.    State-court contempt and enforcement proceedings

In early January 2008, DCYF filed a motion with the Superior Court stating that the plaintiffs' behavior since the issuance of the dispositional order had made "clear that [they] are aware of [it], but are electing to refuse to comply," and, as a result, asked the Superior Court to hold them in contempt.  The Superior

18

Court refused to grant that relief ex parte, but ordered the plaintiffs to appear at a hearing on the motion.

When that hearing took place, however, the plaintiffs' "attorney appeared, but [they] failed to appear" personally. In re Grodman, No. 06-J-011 (N.H. Super. Ct. Mar. 26, 2008). Immediately prior to the hearing, the plaintiffs, through their counsel, filed a motion with the Superior Court seeking to vacate its dispositional order and to "dismiss" the motion for contempt. The motion stated, among other things, that the plaintiffs had "removed [Eleonora] from the State of New Hampshire because they fear that [she] is in mortal danger if she is again in the custody of the State."

At the hearing, the Superior Court found the plaintiffs in contempt of the dispositional order. Id.  More than 30 days later, DCYF filed a motion with the Superior Court requesting the issuance of bench warrants for the plaintiffs, stating that, "neither [plaintiff], directly or through their attorney of record, has surrendered their child to custody of [DCYF], nor given any indication even of where they or their child is."  The Superior Court granted the motion on April 30, 2008.

**4.    Plaintiffs' apprehension and subsequent criminal proceedings**

**a.    Search and traffic stop**

The plaintiffs allege that in the meantime, on January 16, 2008, McVeigh (a DCYF employee) "organized and then participated in [a] warrantless entry and search" of Stuart Grodman's apartment in Boston, Massachusetts, with three Boston police officers named as defendants here.  After McVeigh and the officers unsuccessfully attempted to contact the manager of the building, a "maintenance man assisted the officers inside of the apartment," which "only had limited furniture inside of it and was nearly empty."

The plaintiffs also allege that, a week or so after the Superior Court's issuance of the bench warrants, defendant Wade Parsons, chief of the Danville Police Department, "issued a BOLO ('Be On the Lookout for')" to police in Haverhill, Massachusetts, requesting the plaintiffs' arrest, and Eleonora's detention.  In response, the Haverhill Police Department stopped the plaintiffs while they were driving in their car.  But they were not taken into custody, because, they say, "Parsons determined that he could not arrest [them] in Massachusetts" on bench warrants issued by a New Hampshire court.

### b.   Plaintiffs' arrests and detention

The plaintiffs further allege that, on May 30, 2008, Parsons and defendant James Nye, an officer with the Rockingham County Sheriff's Department, "prepared, but failed to file criminal complaints in the Plaistow District Court" charging the plaintiffs with interference with custody.  See N.H. Rev. Stat. Ann. § 633:4.  Instead, according to that court's records, Parsons filed an application for arrest warrants for the plaintiffs based on that offense, and the warrants issued, on May 30, 2008.  Among other things, Parsons's warrant application quoted the statement by the plaintiffs' attorney in their filing during the Superior Court proceedings that the plaintiffs had "removed [Eleonora] from the State of New Hampshire because they fear that [she] is in mortal danger if she is again in the custody of the State."

Following the issuance of the warrants, Katz was arrested in Boston, Massachusetts, on June 5, 2008.  The plaintiffs allege that Nye attended Katz's arraignment and "inappropriately spoke to" her defense attorney, saying that "all of [Katz's] addresses come back to U.P.S. stores so [Nye] knew that everything [Katz] was telling [counsel] was lies."  Katz was denied bail.

The plaintiffs further allege that, after the hearing, Nye contacted both the Social Security Administration, "ensur[ing]

21

that the [plaintiffs'] Social Security retirement payments were stopped," and the Bureau of Immigrations and Customs Enforcement, "causing [it] to place an immigration hold on [Katz] without bail."  The plaintiffs say that Nye and defendant Cathy Champion, another employee of the Rockingham County Sheriff's Department, "represented to third parties that there were federal proceedings pending against Katz in federal immigration court" (as the plaintiffs themselves allege, there was an "immigration hold" on Katz at that point).

Katz refused to waive extradition to New Hampshire, so, the plaintiffs allege, Nye and Parsons prepared a "governor's warrant" to secure her return to this state.  The plaintiffs allege that this warrant attached copies of the bench warrants issued by the Superior Court on April 30, 2008, referring to them as "criminal warrants" when in fact "there were no criminal charges brought against the [plaintiffs] until after [Katz's] extradition."  Again, however, the Plaistow District Court had issued warrants for the plaintiffs' arrest for interference with custody on May 30, 2008.

Katz was eventually extradited to New Hampshire.  But the plaintiffs allege that, until then, Katz spent approximately 90 days in jail "without bail on the request of" Nye, Champion, and other as-yet unidentified parties.  The plaintiffs further allege

that, following Katz's extradition, she was jailed in New
Hampshire for approximately 40 days, including 5 days in
"solitary confinement."  The plaintiffs say that Nye and other
as-yet unidentified defendants "requested a no contact order"
prohibiting Katz from contacting Grodman "so [she] could not
obtain copies of the necessary documents to prove her
citizenship."  In fact, the plaintiffs allege, Nye and other
unnamed parties "refused to believe, despite documentary evidence
to the contrary, that [Katz] was a naturalized [United States]
citizen," subjecting her to a "false immigration detainer" which
kept her in custody "even after [she] was granted bail."  Based
on her entry of a guilty plea, Katz was convicted on a charge of
interference with custody in Rockingham County Superior Court on
May 24, 2010.

Grodman, for his part, was arrested on July 9, 2008, and
spent three days in jail.  He was convicted on a charge of
criminal contempt in Rockingham County Superior Court on June 27,
2012, though his appeal of that conviction to the New Hampshire
Supreme Court is pending.

  **c. Eleonora's placement at Crotched Mountain**

Also on July 9, 2008, Eleonora was taken into DCYF custody
and placed at Crotched Mountain.  The plaintiffs allege that, at
that point, Eleonora began "suffering greatly from [] abusive and

23

negligent treatment" at the hands of Crotched Mountain staff, including "excessive use of chemical restraints" in the form of anti-psychotic drugs.  They further allege that, "for substantially the entire period" of Eleonora's time at Crotched Mountain, she was not "allowed to have any contact" with Katz or Stuart Grodman, and was allowed visitation with Arnold Grodman only "at most once per week . . . supervised with several attendants typically present to observe and intervene."

## 5.  Guardianship proceedings

### a.   Prior to the Crotched Mountain placement

The plaintiffs allege that, on December 3, 2007, McVeigh "requested that [Katz] execute medical releases and other forms consenting to [Eleonora's] placement at Crotched Mountain and waiving the Grodman family's right to privacy."  This was just after the Superior Court had issued the dispositional order which, among other things, gave DCYF "direct access to all of Eleonora's medical, educational, psychological and behavioral providers, including access to all [their] records" and ordered the plaintiffs to "sign all necessary releases."  See Part II.A.2.b, supra.  Katz nevertheless refused to sign the documents.  "Because [she] refused to sign away her family's rights," the plaintiffs allege, "DCYF had to file for guardianship of [Eleonora] in order to effectuate the educational

24

placement at" Crotched Mountain.  DCYF proceeded to file an ex
parte petition for guardianship over Eleonora which, the
plaintiffs allege, "was granted, without any hearing [or]
notice," but "dismissed in March 2008 for lack of service."

The plaintiffs further allege that DCYF filed another ex
parte guardianship petition on June 4, 2008, which was granted
that same day.  The plaintiffs claim that, when he filed DCYF's
ex parte petition for guardianship of Eleonora on June 4, 2008,
defendant Didier Matel, a DCYF attorney, "knew, or should have
known, [it] omitted material facts."  The petition "was sworn to
under oath" by defendant Kathleen Grondine, whom the amended
complaint identifies as McVeigh's supervisor at DCYF.

The plaintiffs claim that, between the dismissal of DCYF's
initial guardianship petition in March 2008 and the grant of its
subsequent one in June 2008, "all contact between DCYF agents and
[Eleonora's] health care providers was inappropriate and
interfered with [her] receipt of proper health care," as well as
the plaintiffs' "constitutional right to privacy" and unspecified
"federal statutory rights."  The plaintiffs also claim that it
was "illegal and unconstitutional" for "DCYF, Rockingham County
Sheriff's Office, Danville Police and all other law enforcement
agencies" to exchange "confidential medical information" with a
Massachusetts clinic that had recently treated Eleonora.

25

The only alleged "contact" between any of the defendants and
any of Eleonora's medical providers during the period between the
DCYF guardianships, however, is a June 3, 2008 telephone call
between Nye and an attorney for the clinic.  The plaintiffs
allege that, when the attorney returned a call from Nye, the
attorney asked Nye for "current updated custody orders" for use
in showing cause, in a Massachusetts court, why the clinic had
refused to turn over records to Katz.  The plaintiffs do not
allege that any "confidential medical information" was exchanged
during these calls.

**b.   After the Crotched Mountain placement:  Family Division**

The plaintiffs allege that, in September 2008, DCYF
voluntarily dismissed its then-pending petition for guardianship
over Eleonora, repositing guardianship in the plaintiffs.  The
plaintiffs claim that Crotched Mountain remained unaware of this
development for a period of time, during which it "provided
[Eleonora] with medications she was not approved by her guardian
to receive."  The day after DCYF's guardianship had terminated,
however, Grodman himself had provided DCYF with written
authorization to allow Eleonora to receive "any and all medical
care and/or psychological care required."

The plaintiffs further allege that, in December 2008,
Grodman was asked to approve "some additional changes to one of

26

[Eleonora's] medication dosages."  He responded, the plaintiffs
say, with "entirely reasonable" requests for "additional
information [on] why [Eleonora's] medication needed to be
changed"--but DCYF and Crotched Mountain "refused to provide
[him] with the information he requested."  After several weeks of
"back and forth" with defendant Svreenivas Kattragadda, the
doctor "with primary responsibility for [Eleonora's] mental
health" while she was at Crotched Mountain, its staff "began to
threaten" Grodman that they would ask DCYF to seek to resume its
guardianship over Eleonora "so that [she] could be given the
increased dosages of medication."  Grodman, the plaintiffs
allege, "refused to be intimidated" and, on March 23, 2009,
revoked the medical authorization he had given DCYF.

     In response, on April 3, 2009, DCYF filed an ex parte
petition with the then-Brentwood Family Division seeking
guardianship over the person of Eleonora.  The petition alleged
that, despite the Superior Court's dispositional order (which
commanded that DCYF "have direct access to all of Eleonora's
medical, educational, psychological and behavioral providers and
that the plaintiffs "sign all necessary releases"), Grodman had
refused to authorize any changes to Eleonora's medication and,
indeed, had purported to revoke authorizations he had previously
given.  The petition claimed that, as a result, Crotched Mountain

27

staff was "unable to change or administer any further medications
to Eleonora," who was "decompensating."  Acting on the petition,
the Family Division granted DCYF temporary guardianship over
Eleonora for 30 days.

The plaintiffs allege that this petition, "acknowledged
under oath by defendant Karen Weinberg," a DYCF supervisor,
"contained many false statements which [she] knew, or should have
known, would mislead the court as to the true circumstances" of
Eleonora's treatment at Crotched Mountain.  On April 14, 2009, in
fact, the plaintiffs filed a motion to terminate DCYF's
guardianship over Eleonora, alleging that DCYF "committed fraud
on the court" through its April 3 petition, and filed their own
petition for guardianship.

But after a hearing, at which the plaintiffs both appeared,
the Family Division denied the plaintiffs' petition for
guardianship and granted guardianship over Eleonora to DCYF until
her eighteenth birthday.  In re Grodman, No. 2009-G-25 (N.H. Fam.
Div. Apr. 30, 2009).  The Family Division ruled that

> DCYF has established clearly and convincingly that the
> best interest of Eleonora requires the substitution of
> parental care for [her] specifically to provide
> essential physical and safety needs.  The sharp and
> significant decline in Eleonora's condition
> . . . combined with the parent's refusal to allow
> Crotched Mountain to administer any medical or mental
> health treatment requires appointment of a guardian to
> allow Crotched Mountain to treat Eleonora.

28

Id. at 2.

A few weeks later, on May 18, 2009, DCYF filed a petition with the Family Division requesting that it extend its jurisdiction over Eleonora beyond her eighteenth birthday.[8]  The petition does not ask for ex parte relief and, indeed, states that it was served on both of the plaintiffs.  They nevertheless allege that the petition was filed ex parte, on May 29, 2009.

In any event, the Family Division held a hearing on the petition on or about May 29, 2009, which the plaintiffs did not attend.  After the hearing, at which Roy (who had previously served as Eleonora's guardian ad litem in the neglect proceedings in the Family Court, see Part II.A.2.a.i, supra) was once again appointed to serve as Eleonora's guardian ad litem, the Family Division granted DCYF's petition "on a temporary basis until June 23, 2009."  In re Grodman, No. 2009-G-25 (N.H. Fam. Div. May 29, 2009).  The court found that doing so was in Eleonora's best interest because, among other things, she was "still not

---

[8]Under New Hampshire law, a guardianship over a minor terminates upon his or her eighteenth birthday, N.H. Rev. Stat. Ann. § 463:15, I, but a court can retain jurisdiction over the minor beyond that date "with the continuing consent of the minor" and if certain other conditions are satisfied, including that DCYF "has previously been appointed guardian," id. § 463:15, II.

stabilized and it will be at least a number of months before she can regain her stability."[9]  Id.

The Family Division later held another hearing on the petition to extend jurisdiction, which both plaintiffs attended. The Family Division ruled that "the requirements for this Court to retain jurisdiction [over Eleonora] after her [eighteenth] birthday have been established by the evidence presented by the hearing . . . .  Accordingly, the guardianship previously granted to DCYF is issued as a permanent guardianship."  In re Grodman, No. 2009-G-25 (N.H. Fam. Div. Mar. 16, 2010).  Under New Hampshire law, this guardianship terminated when Eleonora turned 21.  See N.H. Rev. Stat. Ann. § 463:15, III(1)(c).

### c.   After the Crotched Mountain placement:  Probate Court

The Probate Division subsequently appointed Grodman as guardian over Eleonora's person.  In re Grodman, No. 2009-GI-1289 (N.H. Cir. Ct. Prob. Div. July 7, 2011).  The court found that Eleonora was incapacitated and, as such, incapable of managing

---

[9]The same day this order issued, the plaintiffs filed a notice of appeal purporting to appeal it, and the Family Division's prior order granting DCYF guardianship over Eleonora until she turned eighteen, to the New Hampshire Supreme Court. This appeal was later dismissed, however, after the plaintiffs failed to deposit payment for transcripts as ordered.  In re Eleonora G., No. 2009-0395 (N.H. Sept. 10, 2009).  The plaintiffs nevertheless allege that they had no notice of the May 2009 guardianship order until after their time to appeal expired.

her own affairs.  Id.  The court also found that Grodman was "a capable and appropriate person to appoint . . . , well able to understand, choose, and direct resources available to the ward to meet her needs."  Id.  This appointment gave Grodman, among other powers, "[t]he right and authority to determine if refusal should be made or consent should be given to any medical or other professional care, counseling, treatment, or service."  Id. Grodman promptly exercised this authority to remove Eleonora from Crotched Mountain.

**B.  Procedural history**

**1.  Plaintiffs' initial complaint and amendments**

On September 17, 2010, the plaintiffs commenced this action by filing a complaint in this court naming Katz, Grodman, and Eleonora as plaintiffs and McVeigh, Matel, Weinberg, Parsons, Katragadda, and a "Dr. Carl Cooley" as defendants.  The complaint, which contained seven separately numbered counts, stated that it had been prepared by an attorney, Louis A. Piccone, who was "pending admission pro hac vice."  In November 2010, a member of the bar of this court, Francis J. McDonough, filed a motion to admit Piccone pro hace vice, which was granted.

In early 2011, the defendants named in the original complaint began appearing, some answering and others filing

31

motions to dismiss.  On March 3, 2011, the plaintiffs moved for leave to file an amended complaint, see Fed. R. Civ. P. 15(a)(2), which named an additional plaintiff, Stuart Grodman, as well as a number of additional defendants (though dropping Cooley).  This pleading contained 25 separately numbered counts.  Many of the defendants named in the first complaint filed objections to this motion to amend.  Ultimately, however, the motion was deemed withdrawn when the plaintiffs failed to file a certificate of service to the motion as ordered.  Order of Mar. 22, 2011.

The plaintiffs then filed another motion for leave to file an amended complaint which contained 32 separately numbered counts, but no longer named Eleonora as a plaintiff.  Several defendants objected to the motion for leave to file this proposed amended complaint, and another simply moved to dismiss it.  This court granted the motion to amend "without prejudice to the futility arguments raised in the defendants' objections" and denied the motions to dismiss, similarly "without prejudice to raising those arguments, and any additional ones, in refiled motions to dismiss directed at the amended complaint."  Order of Apr. 14, 2011.

It is this version of the complaint that is subject to the defendants' pending motions to dismiss or for judgment on the pleadings.  Aside from a request for declaratory relief that

32

Matel's "actions seeking and obtaining custody of [Eleonora] after she reached the age of majority were unethical and that any further involvement by [Matel] with [the plaintiffs or Eleonora] would constitute unethical behavior by an attorney," the amended complaint seeks only damages.

## 2.   Appointment of "next friend" for Eleonora

In June 2011, the plaintiffs filed yet another motion to amend their complaint, this time so that they could reintroduce claims on behalf of Eleonora, as her "next friends." See Fed. R. Civ. P. 17(c)(2). The court scheduled an evidentiary hearing on the plaintiffs' request for this relief, noting that Grodman's then-recent appointment as guardian of Eleonora's person, see Part II.A.5.c, supra, did not authorize him to bring claims on her behalf. Order of Aug. 2, 2011, at 2 (citing N.H. Rev. Stat. Ann. § 464-A:25, I(a)-(h)). During off-the-record discussions between the court and counsel prior to the hearing, however, the parties agreed that, in lieu of considering the plaintiffs' request for appointment as next friends, the court would contact a local attorney about seeking appointment to that role.[10] Order of Sept. 9, 2011. That attorney, however, declined to seek

---

[10]For this reason, at the hearing, the court denied the plaintiffs' motion for their own appointment as Eleonora's next friends, and to amend the complaint to assert claims on her behalf, as moot.

appointment as Eleonora's next friend, <u>id.</u>, as did two other
attorneys the court subsequently contacted at the parties' joint
suggestion. <u>See</u> Order of Oct. 28, 2011.

Based on these developments, the court ordered that
"litigation of plaintiffs' claims shall proceed," and set a new
schedule for briefing on the motions to dismiss. <u>Id.</u> In
accordance with this schedule, the defendants filed their current
motions to dismiss or for judgment on the pleadings in December
2011, and the plaintiffs--through counsel--filed an omnibus
objection to those motions in January 2012.

The plaintiffs later notified this court that the Probate
Division had appointed Grodman as guardian of Eleonora's estate,
<u>see</u> <u>In re Grodman</u>, No. 2009-GI-1289 (Feb. 12, 2012), which, under
New Hampshire law, authorizes him to bring claims on her behalf,
among other things, N.H. Rev. Stat. Ann. § 464-A:26, I.

**3.  Withdrawal of plaintiffs' counsel**

In the meantime, Piccone, then one of the plaintiffs'
attorneys of record in this matter, moved to withdraw, explaining
that his license to practice law in Pennsylvania (the sole
jurisdiction in which he is admitted) had been suspended. The
court granted the motion. Order of Sept. 19, 2011. Roughly one
month later, Piccone notified the court that Pennsylvania had
reinstated his license. He subsequently sought admission pro hac

34

vice again, but the court refused to grant that relief, finding
that, based on his performance in this case and others, he had
"engaged in a pattern of behavior that has resulted in the
wasting of judicial resources . . . mak[ing] his admission pro
hac vice inappropriate." Order of Apr. 20, 2012 (quotation marks
omitted).  Piccone filed a notice of appeal of this decision, but
it was dismissed for lack of prosecution after he failed to
respond to orders by the court of appeals.  Piccone v. McVeigh,
No. 12-1683 (1st Cir. Aug. 10, 2012).

        After this court denied the motion to re-admit Piccone pro
hac vice, McDonough, then the plaintiffs' remaining counsel of
record in the case, moved to withdraw.  In support of the motion,
McDonough stated that, as a solo practitioner, he lacked "the
resources or means to support a complex litigation such as this
matter," and that his relationship with Katz had "broken down
completely," with her questioning his "integrity and ethical
conduct" at several points.  The court granted the plaintiffs
leave to file a pro se objection to McDonough's motion to
withdraw, then conducted a hearing at which the plaintiffs,
Stuart Grodman, and McDonough appeared.

        Based on the presentations at the hearing, the court granted
McDonough leave to withdraw on June 18, 2012, and stayed the case
for 30 days to allow the plaintiffs to find new counsel.  When

that deadline arrived, the plaintiffs asked for an additional 60
days to secure a new lawyer.  The court granted that relief,
continuing the stay until September 18, 2012.  Order of Aug. 13,
2012.  The court then denied the defendants' pending motions to
dismiss or for judgment on the pleadings "without prejudice
pending the appearance of counsel on the plaintiffs' behalf,
notice by the plaintiffs that they will appear pro se, or October
12, 2012, whichever is earliest."  Order of Sept. 13, 2012.
Based on the filings of pro se appearances by each of the
plaintiffs, and Stuart Grodman, the court later lifted the stay.
Order of Oct. 3, 2012.  The defendants subsequently reinstated
their motions to dismiss and for judgment on the pleadings.

**4.   Plaintiffs' fourth motion to amend**

On December 4, 2012, the plaintiffs, now proceeding pro se,
filed a motion to amend their complaint yet again.  The proposed
amended complaint they seek to file differs from the amended
complaint accepted for filing in April 2011 (and which, again, is
the version of their complaint subject to the pending motions to
dismiss and for judgment on the pleadings) in that:  (1) it names
Eleonora as a plaintiff, (2) it states that Grodman is "guardian
of both the person and the estate of Eleonora Grodman," and that
he is bringing this action in his capacity as such, as well as on
his own behalf, and (3) it names Rockingham County itself as a

36

defendant.  This proposed amended complaint also adds causes of
action against certain defendants for malicious prosecution,
abuse of process, and violation of Katz's equal protection rights
under the Fifth Amendment, as well as a request for a permanent
injunction.  (The plaintiffs had also previously filed another,
narrower, motion to amend, seeking to add Eleonora as a
plaintiff, Rockingham County as a defendant, and a single new
claim, for injunctive relief.)

**III. <u>Analysis</u>**

In moving to dismiss, or for judgment on the pleadings on,
the claims in the amended complaint, the defendants raise a host
of arguments.  For the reasons discussed in detail below, many of
those arguments are correct, and necessitate dismissal of the
amended complaint in its entirety.

Before embarking on that discussion, however, it should be
noted that the organization of the amended complaint makes an
analysis of its sufficiency unnecessarily complicated.  The
amended complaint consists of a section of factual allegations
spanning more than 300 numbered paragraphs, followed by, as noted
at the outset, 32 separately numbered counts.  The allegations of
each count, however, consist largely if not entirely of
boilerplate asserting a violation of some broadly asserted right,

e.g., the "right to family association," without referring to which of the defendants' alleged actions (which, again, are set out in the more than 300 numbered paragraphs that make up the body of complaint) constitute that violation.  Nevertheless, the court has endeavored, with limited assistance from the plaintiffs' objection to the motions, to identify what alleged conduct, by what defendant or defendants, underlies each of the 32 claims asserted in the amended complaint.

## A.   Claims not properly before this court

## 1.   Claims on Eleonora's behalf

The amended complaint names Eleonora as a plaintiff but, by the time it was filed, the Probate Division had deemed her incompetent to manage her own affairs.  <u>See</u> Part II.A.5.c, <u>supra</u>. Accordingly, she could not have brought these claims on her own behalf, but only through a representative or next friend.  <u>See</u> Fed. R. Civ. P. 17(c).  Again, this court made significant efforts toward finding a next friend to represent Eleonora's interests in this matter, but was unable to do so.  <u>See</u> Part II.B.2.b, <u>supra</u>.

It is true that, in the interim, the Probate Division has appointed Grodman as guardian of Eleonora's estate, which, under New Hampshire law, authorizes him "to prosecute or defend

38

actions, claims, or proceedings in any jurisdiction for the
protection of [her] estate's assets." N.H. Rev. Stat. Ann.
§ 464-A:26, I.  But Grodman cannot bring claims here on
Eleonora's behalf without retaining counsel to represent her.
"By law an individual may appear in federal courts only pro se or
through legal counsel," and not through "third-party lay
representation." Herrera-Venegas v. Sanchez-Rivera, 681 F.2d 41,
42 (1st Cir. 1982); see also L.R. 83.6(b).  So Grodman, a non-
lawyer, cannot represent Eleonora in this action.  See O'Diah v.
Volkswagen of Am., Inc., 91 Fed. Appx. 159, 160 (1st Cir. 2004)
(observing that a father would need to be represented by counsel
to assert claims on behalf of his incompetent son).

Any claims in the amended complaint based solely on alleged
violations of Eleonora's rights, then, must be dismissed without
prejudice.  As best as the court can tell, these claims are:

• "false imprisonment of [Eleonora] Grodman" (count 13);

• "joint and several liability" for that false
imprisonment (count 14);

• "illegal seizure" of Eleonora (count 21); and

• "negligence" against Roy, who allegedly "owed
[Eleonora] Grodman a duty of care" (count 30).

The plaintiffs' objection to the motions to dismiss fails to
explain how they, as opposed to Eleonora, could bring a claim for
her alleged "false imprisonment" or "illegal seizure."  (To the

extent these claims seek to recover for her separation from them or her placement at Crotched Mountain as a violation of the plaintiffs' constitutional right to family integrity, they are addressed <u>infra</u> at Part III.C.1.a, insofar as they are not barred by the <u>Rooker</u>-<u>Feldman</u> doctrine, <u>see</u> <u>infra</u> at Part III.B.2.) Accordingly, counts 13, 14, 21, and 30 are dismissed without prejudice.  The balance of the amended complaint is likewise dismissed without prejudice insofar as it asserts any claims that belong to Eleonora (this includes the Rehabilitation Act claim insofar as it is brought on her behalf, <u>see</u> <u>infra</u> Part III.A.5).

## 2.    Claims challenging state-court orders

While the plaintiffs insist otherwise in their objection to the motions to dismiss, it is clear that significant portions of their amended complaint challenge the Superior Court's decision awarding custody of Eleonora to DCYF, placing her at Crotched Mountain, imposing restrictions on the plaintiffs' visits with her during the placement, and requiring them to sign various releases for her care.  <u>See</u> Part II.A.2.b, <u>supra</u>.

First, the plaintiffs complain that DCYF "was awarded custody of [Eleonora] without an appropriate showing of abuse or neglect and in violation of [the [plaintiffs'] constitutional rights," because "neither the [Superior] Court, nor DCYF, had access to the information required to make such a finding."

Second, the plaintiffs assert that, "[i]n violation of
constitutional norms," the Superior Court granted DCYF's proposed
dispositional order "without modification, and without setting
forth a required or detailed statement of [its] reasons."  Third,
the plaintiffs claim that ordering them to sign releases for
Eleonora's care violated their "constitutionally protected rights
to privacy; to associate with family members; [and] to determine
the course of [her] medical treatment" (numbering omitted).
Fourth, the plaintiffs complain that the dispositional order
"prevented any contact between [Eleonora] and her mother" as well
between Eleonora and Stuart Grodman.[11]  Fifth, the plaintiffs
charge that, upon Grodman's arrest in July 2008, Eleonora "was
taken into state custody without constitutional authority and in
violation of her and her parents' constitutional rights"--and, of
course, it was the dispositional order that awarded custody of
Eleonora to DCYF and directed her placement at Crotched Mountain.

     This court lacks jurisdiction to hear these claims under the
Rooker-Feldman doctrine.  See Rooker v. Fidelity Trust Co., 263

----

          [11]In fact, the dispositional order allowed both plaintiffs
     to visit Eleonora during her placement at Crotched Mountain
     (though it required those visits to take place off-campus and
     placed other restrictions on them), and said nothing one way or
     the other about visits by Stuart Grodman.  Part II.A.2.b, supra.
     Even if the plaintiffs' characterization of the visitation
     provisions were correct, however, that would not change the
     outcome of the Rooker-Feldman analysis.  See infra this Part.

U.S. 413 (1923); D.C. Ct. of Appeals v. Feldman, 460 U.S. 462 (1983).  The doctrine protects the Supreme Court's exclusive jurisdiction to review state court decisions for constitutional error by depriving the federal district courts of jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  ExxonMobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005).  The plaintiffs' claims that the Superior Court's dispositional order violates their constitutional rights in various respects clearly fit that description.  Indeed, the court of appeals has held that the Rooker-Feldman doctrine prevents a parent who loses custodial rights as the final outcome of a state-court proceeding from challenging that outcome as a violation of "his federal substantive due-process rights as a parent."  Miller v. Nichols, 586 F.3d 53, 59 n.2 (1st Cir. 2009) (discussing Hoblock v. Albany Cty. Bd. of Elections, 422 F.3d 77, 97 (2d Cir. 2005)).  As plainly shown by the preceding allegations of their amended complaint, that is precisely what the plaintiffs are trying to do here--at least in part.

But the plaintiffs are also seeking relief for allegedly unconstitutional conduct by defendants in initiating and

prosecuting the neglect proceedings, as well as the guardianship
proceedings. As this court has observed, "those kinds of claims
do not implicate the Rooker-Feldman doctrine because they do not
require this court to conduct de facto appellate review of the
[state courts'] decisions, but to assess the legality of the
defendants' actions." Hall v. Brooks, 2009 DNH 015, 11-2 (citing
cases from various courts of appeals), aff'd, No. 09-1594 (1st
Cir. Apr. 9, 2010) (unpublished disposition); see also, e.g.,
Kovacic v. Cuyahoga Cty. Dep't of Children & Fam. Servs., 606
F.3d 301, 310 (6th Cir. 2010) (ruling that Rooker-Feldman did not
bar claims that did "not seek review or reversal of the decision
of the [state] court to award temporary custody to the state, but
instead focus on the conduct of [the state child welfare agency]
and of the social workers that led up to [that] decision").

The Rooker-Feldman doctrine, then, has no effect on the
court's jurisdiction over the plaintiffs' claims that, e.g., one
or more of the defendants commenced the neglect proceedings in
retaliation for the plaintiffs' exercise of their First Amendment
rights, or provided false or misleading information to the Family
Division during the guardianship proceedings (though, as
discussed infra, those claims fail for other reasons). But the
doctrine does deprive this court of jurisdiction over the
plaintiffs' claims, just catalogued, that the outcomes of those

43

proceedings--including, most significantly, the dispositional
order--violated their constitutional rights.[12]   The amended
complaint is dismissed insofar as it asserts such claims.

**3.   Claim for a declaratory judgment**

As count 32 of the amended complaint, the plaintiffs pursue
"a judicial declaration" that Matel's "actions in seeking and
obtaining custody of [Eleonora] after she attained the age of
majority were unethical and that any further involvement by [him]
with [plaintiffs] would constitute unethical behavior by an
attorney."   This court lacks jurisdiction to hear this claim.

"Article III of the Constitution restricts federal courts to
the resolution of actual cases and controversies," and thus
"ensures that courts do not render advisory opinions." Overseas
Mil. Sales Corp. v. Giralt-Armada, 503 F.3d 12, 16-17 (1st Cir.
2007) (citing U.S. Const. art. III, § 2, cl. 1).   Generally,

---

[12]While the plaintiffs say that the hearing officer's order
directing Eleonora's placement at the Brattleboro Retreat or a
similar facility was "illegal," see Part II.A.1.b, supra, they do
not specify the nature of that "illegality."   The IDEA gives this
court jurisdiction to review such decisions, 20 U.S.C.
§§ 1415(i)(1)(2)(A), but the plaintiffs have already tried to
seek review of the hearing officer's decision by filing an action
in this court, which Magistrate Judge Muirhead dismissed because
the plaintiffs failed to exhaust their administrative remedies.
See note 6, supra.   The plaintiffs do not allege that they have
since done so and, in any event, any challenge to the hearing
officer's decision, rendered in February 2006, would be barred by
the IDEA's statute of limitations, 20 U.S.C. §§ 1415(i)(1)(2)(B).

"issuance of a declaratory judgment deeming past conduct illegal is . . . not permissible as it would be merely advisory." Am. Civil Liberties Union of Mass. v. United States Conference of Catholic Bishops, ___ F.3d ___, 2013 WL 150321, at *6 (1st Cir. Jan. 15, 2013).  The plaintiffs do not explain how a declaration that Matel committed "unethical acts" in seeking custody of Eleonora after she turned 18 (a course of conduct that ended in March 2010, when the Family Court awarded DCYF custody of Eleonora until her 21st birthday, see Part II.A.5.c, supra) would amount to anything more than an advisory opinion which, as just explained, this court lacks the jurisdiction to grant.

This court also lacks jurisdiction to declare that Matel's "further involvement" with the plaintiffs would be "unethical." Not only have the plaintiffs failed to allege facts suggesting "a likelihood of future unlawful conduct on the defendant's part," Maine v. Dep't of Labor, 770 F.2d 236, 238 (1st Cir. 1985), this claim is also not ripe for adjudication, because its resolution "involves uncertain and contingent events that may not occur as anticipated or may not occur at all." Ernst & Young v. Depositors Econ. Protection Corp., 45 F.3d 530, 536-37 (1st Cir. 1995) (internal quotation marks omitted).  Clearly, this court cannot decide the legality of Matel's future conduct without any basis for anticipating what that conduct might be (aside from his

45

"involvement" with the plaintiffs), to say nothing of whether it
will occur at all.  The claim for a declaratory judgment against
Matel (count 32) is dismissed.

**B.   Claims not plausibly alleged**

As noted at the outset, the plaintiffs' two principal
theories are that all of the defendants engaged in the conduct
alleged in the amended complaint (1) in retaliation for the
plaintiffs' exercise of their First Amendment rights "to legally
advocate for appropriate special education" for Eleonora and
(2) as part of a conspiracy to effect that retaliation, as well
as to (at least as to certain defendants) "increase the flow of
money into the state of New Hampshire," allegedly by receiving
funds dependent on keeping Eleonora in state custody.

The amended complaint, however, fails to state a plausible
claim for either retaliation or conspiracy, because (among other
problems) its allegations in support of those theories consist
solely of "'labels and conclusions'" and "'naked assertions,'"
rather than the requisite "factual content that allows the court
to draw the reasonable inference that the defendant[s] [are]
liable for the misconduct alleged." Iqbal, 556 U.S. at 678
(quoting Twombly, 550 U.S. at 555-57) (bracketing omitted).  The
amended complaint also fails to state constitutional claims for

46

violations of the plaintiffs' rights to privacy or "excessive use
of chemical restraints," for retaliation under the Rehabilitation
Act, or for municipal or supervisory liability.

**1.   Section 1983 claims against DCYF**

As an initial matter, the amended complaint improperly
asserts a number of § 1983 claims against DCYF.  The plaintiffs
cannot bring any claim against DCYF under § 1983 because, as a
state agency, it is not a "person" subject to liability under
that statute.  See, e.g., Brown v. Newberger, 291 F.3d 89, 92
(1st Cir. 2002) (dismissing § 1983 claims against state child
welfare agency).  Accordingly, all of the § 1983 claims against
DCYF are dismissed, and will not be discussed further.

**2.   Retaliation**

**a.   Defendants other than Lovett and Timberlane**

As count 18 of their amended complaint, the plaintiffs claim
that "all defendants maliciously and with intent to injure, or
recklessly and with callous indifference, interfered with
plaintiffs' . . . rights to exercise free speech by retaliating
against the plaintiffs . . . for demonstrating against the
negligent education of their daughter" (emphasis added).  While
the allegations of this count contain no further elaboration, it
appears to refer to the "public demonstration protesting
[Timberlane's] policies" that the plaintiffs say they organized

47

in April 2004.  <u>See</u> Part II.A.1.a, <u>supra</u>.  The amended complaint also refers to other "advocacy" the plaintiffs undertook in service of Eleonora's "appropriate special education," <u>viz.</u>, Katz's complaints "to various state agencies that oversee the conduct of [] Timberlane and its employees," including Lovett.

"In order to succeed on a First Amendment retaliation claim, a party must show that her conduct was constitutionally protected, and that this conduct was a substantial factor or a motivating factor driving the allegedly retaliatory" conduct. Gorelik v. Costin, 605 F.3d 118, 123 (1st Cir. 2011) (quotation marks, ellipse, and bracketing omitted).  The allegations just described fail to plausibly show how the plaintiffs' assertedly protected conduct--complaining about Timberlane's treatment of their daughter in 2004--could have provoked retaliatory conduct, in 2006 and later, on the part of the vast majority of the two dozen defendants named here.

Indeed, the amended complaint provides no reasonable basis to infer that many of the defendants (e.g., the various law enforcement officers who, so far as the amended complaint reveals, had no involvement with any of the plaintiffs until 2008) even knew, at the time they took those complained-of actions, about the plaintiffs' protests against Timberlane in 2004.  Even as to those defendants who could have plausibly known

of those protests in advance of their challenged conduct (e.g.,
DCYF personnel), the amended complaint provides no reasonable
basis to infer that those defendants would have been interested
in those protests so as to use them as a substantial reason to
take action against the plaintiffs.  In fact, the amended
complaint does not so much as hint at any reason to believe that
the plaintiffs' protests, as "poisonous" as they may have been to
their relationship with Timberlane, would have mattered in the
least to any of the other defendants--let alone mattered to the
extent that the defendants would take them as a substantial cause
for retaliation against the plaintiffs.[13]

So the plaintiffs have pled "nothing that would ground a
reasonable inference that [the other defendants] would be moved
to retaliate on [Timberlane's] behalf." Bennett v. St. Gobain
Corp., 507 F.3d 23, 32 (1st Cir. 2007) (relying on this omission
in granting summary judgment against retaliation claim).  This
deficiency is exacerbated by the substantial passage of time
between the protected activity identified in the amended
complaint (again, demonstrations and complaints that occurred in

_____

[13]To the contrary, the amended complaint alleges that, prior
to the filing of the neglect petitions in April 2006, Lovett made
three complaints of neglect to DCYF--all of which it investigated
and determined were unfounded.  See Part II.A.1.a, supra.
Clearing the plaintiffs of neglect allegations hardly seems to
fit the profile of an agency bent on retaliating against them.

and around April 2004) and the non-Timberlane defendants'
challenged activity--which did not even begin until DCYF
commenced the neglect proceedings some two years later.  A gap of
this length "is sufficiently large so that . . . it will not
support an inferred notion of causal connection."  Id.; see also,
e.g., Gonzalez-Droz v. Gonzalez-Colon, 660 F.3d 1, 17 (1st Cir.
2011) ("In order to raise an inference of causation, temporal
proximity must be close.").  The amended complaint thus fails to
state a plausible retaliation claim against the defendants (other
than, arguably, Lovett and Timberlane) because it alleges no
facts giving rise to a plausible inference of retaliatory motive.

### b.   Lovett and Timberlane

Assuming, for the sake of argument, that the plaintiffs
plausibly allege retaliatory motive on the part of Lovett and
Timberlane (who, unlike the rest of the defendants, were the
targets of the plaintiffs' protests and the other protected
activity they identify), the amended complaint still fails to
state an actionable retaliation claim against either of them.  To
prevail on that claim, the plaintiff must show not only that his
protected activity substantially caused the defendant's
challenged conduct, but also that the defendant's conduct would
have "'deter[red] a similarly situated individual of ordinary
firmness from exercising his or her constitutional rights.'"

Starr v. Moore, 849 F. Supp. 2d 205, 209 (D.N.H. 2012) (quoting
Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2002)); accord Starr
v. Dube, 334 Fed. Appx. 341, 342-43 (1st Cir. 2009).  To the
extent the amended complaint even arguably attributes such
conduct to Lovett and Timberlane, that conduct occurred outside
of the applicable limitations period.

The plaintiffs accuse Lovett of "making a steady stream of
provably false allegations" to DCYF.  They also accuse Lovett and
Timberlane of seeking the due process hearing before the
Department of Education that resulted in Eleonora's placement at
the Brattleboro Retreat, see Part II.A.1.b, supra, and of filing
a complaint for another due process hearing, in November 2006,
which the plaintiffs say was dismissed in March 2007.  The
plaintiffs also claim that, in November 2006, Lovett and
Timberlane "improperly interposed themselves as parties" in the
then-pending neglect proceedings.

All of that conduct, however, occurred prior to the Superior
Court's finding of neglect, entered on September 13, 2007.  See
Part II.A.2.a.ii, supra.  That was itself more than three years
before the plaintiffs filed this action, on September 17, 2010.
The statute of limitations on a § 1983 claim brought in New
Hampshire is the three years dictated by N.H. Rev. Stat. Ann.

51

§ 508:4.  See, e.g., Harrington v. City of Nashua, 610 F.3d 24, 28 (1st Cir. 2010).  So the plaintiffs' retaliation claim against Lovett and Timberlane, which arises out of their conduct prior to September 17, 2007, is barred by the statute of limitations, as Lovett and Timberlane argue in their motion to dismiss.

The plaintiffs respond that these defendants' actions before that day were part of a "continuing course of conduct" that "has not stopped until this day."  The continuing violation doctrine, however, does not allow a plaintiff to recover for discrete acts of retaliation that occur outside of the limitations period simply because those acts are related to other acts of retaliation that occurred within the limitations period.  See, e.g., Miller v. N.H. Dep't of Corrs., 296 F.3d 18, 22 (1st Cir. 2002) (discussing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002)).  The plaintiffs do not question that each alleged instance of retaliatory behavior on the part of Lovett or Timberlane (e.g., making a complaint to DCYF or the Department of Education) is a "discrete act" for purposes of this analysis.[14]

_____

[14]Instead, the plaintiffs argue that Timberlane's acts, both within and without the limitations period, emanate from its "policy of taking disabled children into [its] school system to reap financial rewards while terrorizing the parents with DCYF actions."  Leaving aside the conclusory nature of this statement, it ascribes a financial--rather than a retaliatory--motive to Timberlane's alleged "policy" of prompting DCYF investigations against parents.  So, while maintaining a retaliatory policy into

So their assertion that those defendants took additional acts of retaliation within the limitations period does not remove the time-bar from the alleged acts of retaliation outside of the limitations period.  See id.; see also Gorelik, 605 F.3d at 122.

In any event, the amended complaint does not plausibly allege any retaliatory acts by Lovett or Timberlane that occurred within the limitations period.  First, it alleges that "[a]s recently as November 2010, [] Lovett was still showing up at court hearings regarding [Eleonora] and conferring with" Roy (her guardian at litem) and Matel (an attorney for DCYF).  Assuming, dubitante, that the plaintiffs have plausibly ascribed a retaliatory motive to this conduct, it would not, as a matter of law, have "deter[red] a similarly situated individual of ordinary firmness from exercising his or her constitutional rights" and therefore cannot serve as the basis of a retaliation claim. Starr, 849 F. Supp. 2d at 209.

Second, the plaintiffs allege that, on September 17 and September 24, 2007 (i.e., just within the limitations period) a Timberlane attorney communicated with McVeigh, at DCYF, about placing "conditions" on the plaintiffs' visitation with Eleonora

---

the limitations period can subject a defendant to liability for applications of that policy occurring outside the limitations period, see Muniz-Cabrero v. Ruiz, 23 F.3d 607, 611 (1st Cir. 1994), the plaintiffs have not alleged any such policy here.

53

during her time at Crotched Mountain.  According to the amended
complaint, however, the "conditions" discussed in these
communications were simply that the plaintiffs would "not be
permitted to interfere with the delivery of services" by Crotched
Mountain.  There is no plausible way to infer that the
plaintiffs' protests against Timberlane in April 2004 were "a
substantial" or "motivating" factor driving Timberlane's asking
DCYF, in September 2007, to place these facially legitimate
"conditions" on the plaintiffs' visits to Eleonora.  See Air
Sunshine, Inc. v. Carl, 663 F.3d 27, 35-36 (1st Cir. 2011).

       Indeed, the amended complaint itself alleges that one of
Timberlane's communications on this score simply passed along a
request from Shumway, Crotched Mountain's CEO, who (like the rest
of the defendants aside from Lovett and Timberlane) has been
ascribed no reason to know or care about, let alone retaliate
for, the plaintiffs' protests against Timberlane in April 2004.
See Part III.B.1.a, supra.  Because the plaintiffs have plausibly
alleged no retailiatory acts by Lovett or Timberlane within the
limitations period, the retaliation claim against them must be
dismissed.  See Perez-Sanchez v. Public Bldg. Auth., 531 F.3d
104, 107 (1st Cir. 2008).

### 3.   Conspiracy

"A civil rights conspiracy as commonly defined is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another."  Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988).  The Supreme Court held in Twombly that pleading a conspiracy claim under federal law "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made," explaining that neither "[a]n allegation of parallel conduct and a bare assertion of conspiracy" nor a "conclusory allegation of agreement at some unidentified point" will suffice.  550 U.S. at 556-57.  The plaintiffs have offered no more than that to support the several different conspiracies they claim in their amended complaint.

The plaintiffs assert, in count 19, that all 24 of the defendants conspired "to violate rights and protections under 42 U.S.C. § 1983 et seq., amendments I, IV, V, and XIV of the United States Constitution and applicable New Hampshire law."  They go on to say, in the same count, that certain of the defendants (Timberlane, DCYF, the Town of Danville, Rockingham County, Crotched Mountain, and Roy) "conspired to remove [Eleonora] from her parents, maintain custody of [her] at [Crotched Mountain],

55

and discredit [the plaintiffs] in retaliation for [their] assertion of their constitutional rights."

It is difficult to conceive of a conspiracy claim more devoid of the requisite supporting "factual matter to suggest that an agreement was made." Twombly, 550 U.S. at 556. While the plaintiffs, in their objection to the motions to dismiss, cite several paragraphs of their amended complaint to try to show that it is "replete with excerpts from e-mails, court filings, and other documents that show an on-going correspondence and explicit agreement between the defendants," the vast majority of those paragraphs merely assert the existence of a conspiracy in terms no less conclusory than those in the counts themselves. Indeed, none of those paragraphs even alleges any "express agreement," and the only ones referring to any correspondence among any of the defendants describe the communications among Timberlane's attorney, McVeigh, and Shumway about asking the Superior Court to impose conditions on the plaintiffs' visits to Eleonora. See Part III.B.2.b, supra. Needless to say, communications among three of the defendants about that limited subject do not furnish a plausible basis to find an agreement

between them and the numerous other defendants accused of joining the conspiracy claimed in count 19.[15]

Furthermore, while the aim of the conspiracy charged in count 19 is retaliation against the plaintiffs, they have provided no reason to infer that (aside from Lovett and Timberlane) any of the alleged conspirators held any retaliatory animus, as already discussed at length.  See Part III.B.2.a, supra.  The plaintiffs argue in their objection to the motions to dismiss that this conspiracy had another goal, i.e., "taking disabled children into state custody to reap the windfall of federal dollars that these children bring into state coffers." But, putting aside the fact that this is not the theory pled in count 19, the amended complaint likewise offers no factual support for the notion that many of the alleged conspirators, particularly county and local law enforcement officers, stood to benefit in any way from whatever monies the state received on account of Eleonora's custody.  Thus, while the plaintiffs are

---

[15]The plaintiffs also argue that DCYF employees "communicated with the law enforcement officers egging them on to unconstitutional behavior like warrantless entry," pointing to the amended complaint's allegations that McVeigh "organized and then participated in" the search of Stuart's Grodman's apartment with the defendant Boston Police Officers.  Whether or not the warrantless entry into Stuart Grodman's apartment was the product of a "conspiracy," any claim for it is barred by the statute of limitations.  See infra Part III.D.1.c.

correct that they could state a plausible conspiracy claim by alleging "'a basis for inferring a tacit agreement,'" Twombly, 550 U.S. at 557 (quoting DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 56 (1st Cir. 1999)), they have not done that as to the conspiracy claimed in count 19.

Count 20 charges a conspiracy between certain DCYF personnel, on the one hand, and Katragadda and Crotched Mountain, on the other, "to increase the flow of money into the state of New Hampshire and to negatively influence the familial and parental relationships of the plaintiffs," presumably by seeking to place Eleonora at Crotched Mountain.  The amended complaint, however, does not allege that Katragadda or anyone else affiliated with Crotched Mountain even had any involvement in DCYF's decision to seek her placement there.  Without "alleged concerted action," of course, there can be no conspiracy claim. Slotnick v. Staviskey, 560 F.2d 31, 33 (1st Cir. 1977).

Insofar as count 20 relies on Shumway's asking DCYF to ask the Superior Court to place "restrictions" on the plaintiffs' visits to Eleonora during her time there, i.e., that they "not be permitted to interfere with the delivery of services" by Crotched Mountain, that theory also fails.  The only conspiracies actionable under § 1983 are conspiracies that deprive the plaintiff of some federally protected right.  See Thore v. Howe,

466 F.3d 173, 179 (1st Cir. 2006).  Assuming that the plaintiffs have plausibly alleged a conspiracy to secure a Superior Court order restricting them from interfering with Crotched Mountain's delivery of services to Eleonora, and assuming further that such a restriction would have deprived them of a constitutional right (e.g., to decide what medical treatment their child should receive, see infra Part III.A.1.b.i), the Superior Court's order did not in fact impose such a restriction.[16]  To the contrary, as the plaintiffs themselves allege, they retained authority, in the face of the Superior Court order, to make decisions about Eleonora's medical care; they did not lose that authority until DCYF obtained guardianship over Eleonora, and they do not plausibly allege that those guardianships resulted from any conspiracy (nor did the DCYF employees who obtained those guardianships on its behalf violate any of the plaintiffs' clearly established constitutional rights in doing so, see infra Part III.C.2.b.i).  The conspiracy claims are dismissed.

---

[16]The same analysis applies insofar as the plaintiffs are claiming a conspiracy to ask the Superior Court to prevent Katz (or Stuart Grodman) from visiting Eleonora during her time at Crotched Mountain.  The Superior Court's order did not prevent either Katz or Stuart Grodman from visiting Eleonora.  See Part II.A.2.b, supra.

**4.    "Chemical restraints"**

In count 15 of the amended complaint, the plaintiffs allege that a number of the defendants "interfered with plaintiffs' right to have their daughter free from excessive use of chemical restraints by overmedicating" her "without any right or authority to do so," in violation of, among other constitutional provisions, the Fourteenth Amendment.  The defendants named in this count are:  the DYCF employees; Timberlane and Lovett; Crotched Mountain, Shumway, and Katragadda; and Roy.  Aside from Crotched Mountain and Katragadda, however, the amended complaint nowhere alleges that any of these defendants played any role in "medicating" Eleonora, whether during or prior to her time at Crotched Mountain.[17]

For their part, Crotched Mountain, Shumway, and Katragadda are not state actors, but private citizens, and "[a]s a general matter the protections of the Fourteenth Amendment do not extend to private conduct abridging individual rights." NCAA v. Tarkanian, 488 U.S. 179, 191 (1988).  The plaintiffs argue that the Constitution nevertheless dictated the terms of Katragadda's

---

[17]Insofar as this claim is premised on DCYF's seeking guardianship over Eleonora so it could authorize her treatment during its custody of her, it fails to state the violation of any clearly established constitutional right.  See infra Part III.C.1.b.

60

treatment of Eleonora because he was "a willful participant in joint action with the State or its agents," Dennis v. Sparks, 449 U.S. 24, 27 (1980), in this case, DCYF.  As just discussed, however, the plaintiffs have not plausibly alleged the existence of a conspiracy between DCYF employees, on one hand, and Crotched Mountain and Katragadda, on the other.[18]  There is no allegation that any of the DCYF defendants--or, for that matter, any of the public actors named as defendants to this count--had any role in deciding what medications Kattragada, or anyone else who treated Eleonora at Crotched Mountain, should administer.  Count 15 fails to state a claim for relief.

### 5.  Supervisory and municipal liability

#### a.  Bishop

Counts 22 and 23 of the amended complaint seek to hold Bishop, DCYF's director, liable for the alleged violations of the plaintiffs' constitutional rights perpetrated by DCYF employees. "Under 42 U.S.C. § 1983, a supervisory official may be held liable for the behavior of his subordinates only if (1) the

---

[18]This analysis is fatal to any constitutional claim arising out of Katz's alleged deprivation from any contact with Eleonora during her time at Crotched Mountain.  The Constitution did not demand that Crotched Mountain or Shumway, as private actors, allow any contact between Katz and Eleonora.  Nor have the plaintiffs plausibly alleged that Crotched Mountain or Shumway disallowed such contact (as opposed to asking for restrictions on it) as part of a conspiracy.

behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference."  Pineda v. Toomey, 533 F.3d 50, 54 (1st Cir. 2008) (quotation marks and bracketing omitted).

Here, the only link the plaintiffs try to forge between Bishop's conduct and the allegedly unconstitutional behavior of DCYF employees is a "pervasive failure by DCYF to train its staff."  To prevail on a § 1983 claim premised on a failure to train, however, a plaintiff must ordinarily show "[a] pattern of similar constitutional violations by untrained employees" so as to put a supervisor on "notice that a course of training is deficient in a particular respect."  Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011).  The plaintiffs have alleged no facts to make out such a theory here and, indeed, they articulate their failure-to-train theory in only the most conclusory terms (e.g., "[i]t was the policy and practice of the defendants, to fail to properly supervise, train, and control the rank and file social workers who deal with New Hampshire parents . . . so that many of the rank and file routinely threaten, intimidate and coerce parents during child abuse/neglect investigations").  These kinds

62

of allegations, "couched completely as legal conclusions, with the defendant's name merely plugged into the elements of [the] claim" fail to state a claim for supervisory liability under § 1983. Soukup v. Garvin, 2009 DNH 120, 8 (citing Twombly, 550 U.S. at 555). Counts 22 and 23 must be dismissed.

### b.   Town of Danville

Through count 24 of the amended complaint, the plaintiffs attempt to hold the Town of Danville liable for the alleged actions of Parsons, its chief, in procuring their arrests. To support this theory, the plaintiffs allege that Parsons "was the final policymaker for the Town of Danville with respect to its police department," including its decisions to seek the plaintiffs' arrests. "However, 'the fact that a particular official--even a policymaking official--has discretion in the exercise of a particular function does not, without more, give rise to municipal liability based on an exercise of that discretion.'" Roma Constr. Co. v. aRusso, 96 F.3d 566, 576 (1st Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481-82 (1986) (bracketing omitted)). The plaintiffs have alleged nothing more than that to support their claim against the Town of Danville (they do not allege, for example, that Parsons exercised his authority as chief to adopt a policy of seeking arrest

warrants without probable cause).  So their claim against the
Town of Danville (count 24) must be dismissed.

**6.   Rehabilitation Act**

As to count 25 of the amended complaint, the plaintiffs
claim that Timberlane, DCYF, and the DCYF employees named as
defendants violated § 504 of the Rehabilitation Act of 1973.
Pub. L. 93-112, tit. 5, § 504 (codified as amended at 29 U.S.C. §
794(a)).  Under that provision, in relevant part, "[n]o otherwise
qualified individual in the United States . . . shall, solely by
reason of his or her disability, be excluded from participation
in, be denied the benefits of, or be subjected to discrimination
under any program or activity receiving federal financial
assistance."

In support of their Rehabilitation Act claim, the plaintiffs
allege solely that Eleonora "was denied the benefits to which she
was entitled and discriminated against solely on the basis of her
disability by" Timberlane, DCYF, and the DCYF employees named as
defendants.  But the plaintiffs cannot assert any Rehabilitation
Act claim on Eleonora's behalf.  See Part III.A.1, supra.  The
plaintiffs argue that, as the parents of a disabled child, they
"also fall within the protections of the act."  While at least
one court has endorsed this view, see Doe v. County of Centre, 60
F. Supp. 2d 417, 427 (M.D. Pa. 1999), this court need not decide

64

whether to adopt it here, because the plaintiffs have not plausibly alleged that they (as opposed to Eleonora) suffered exclusion or discrimination from a covered program.  Count 25 of the amended complaint must be dismissed.

## 7.  Violation of right to privacy

Counts 7 and 8 of the amended complaint charge that the DCYF and Timberlane defendants violated the plaintiffs' "rights to privacy in their persons and their homes by illegally obtaining highly confidential information from plaintiffs' persons or homes."  But the amended complaint alleges no facts whatsoever to support this claim, and the plaintiffs do not explain in their objection what they could possibly mean by it.  While the plaintiffs complain about seizures _of_ their persons during their eventual arrests, they do not allege that anything, let alone "highly confidential information," was seized _from_ their persons. The plaintiffs also complain about certain defendants' alleged entry into Stuart Grodman's apartment but, again, the plaintiffs do not say that anything was seized during that entry (and insofar as this claim is premised on that, it is barred by the statute of limitations, see _infra_ Part III.D.1.c).[19]  Counts 7

---

[19]The amended complaint contains a number of references to privacy rights in Eleonora's medical records.  Putting aside the fact that, so far as the amended complaint indicates, those records were never accessed by way of any "seizure," any privacy

and 8 fail to state an intelligible claim for relief, let alone a plausible one.

## C.   **Claims barred by qualified immunity**

The bulk of the plaintiffs' remaining federal claims fall into two categories:  (1) claims arising out of their loss of custody and guardianship over Eleonora and (2) claims arising out of the plaintiffs' arrest and incarceration.  The defendants argue that these claims, insofar as they make out any constitutional violations in the first place, are barred by the doctrine of qualified immunity.  The court agrees.

"Qualified immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a constitutional or statutory right and

---

rights in those records belonged to Eleonora, not to the plaintiffs, so they cannot be asserted here.  See Part III.A.1, supra.  This applies to any claim that (a) unnamed Timberlane officials "spread rumors that [Eleonora] had an unspecified psychiatric problem" during her enrollment there (which is also barred by the statute of limitations, see Part III.B.2.b, supra,) (b) the Superior Court wrongfully ordered the plaintiffs to sign releases giving DCYF access to Eleonora's medical providers (which is also barred by the Rooker-Feldman doctrine, see Part III.A.2), (c) Nye wrongfully had contact with one of those providers (and the amended complaint also does not allege that Nye accessed any of Eleonora's confidential medical information during those communications, See Part II.A.5.a, supra).

(2) that the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (quotation marks omitted).  For purposes of this second showing, "[t]he relevant, dispositive inquiry . . . is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." Brosseau v. Haugen, 543 U.S. 194, 199 (2004).  Thus, dismissing a claim based on qualified immunity is appropriate when a court can conclude, based solely on the materials cognizable on a Rule 12 motion, see Part I, supra, that "an objective official in the [defendant's] position, as a matter of law, would have reasonably concluded" that his complained-of actions did not violate the plaintiff's constitutional rights. Maldonado v. Fontanes, 568 F.3d 263, 272 (1st Cir. 2009).  That conclusion is inescapable as to the plaintiffs' remaining constitutional claims.

1.   **Custody and guardianship proceedings**

    a.   **Neglect investigations and proceedings**

    In counts 1-4 of the amended complaint, the plaintiffs claim that the DCYF defendants and the Timberlane defendants "interfered" with the plaintiffs' "rights to family association" and "rights to the care, custody, and management of their children."  As the plaintiffs point out, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of

67

parents to make decisions concerning the care, custody, and control of their children."[20] Troxel v. Granville, 530 U.S. 57, 66 (2000).  The United States Supreme Court, "however, has never recognized the right to familial integrity as absolute or unqualified," and has acknowledged that "the government itself has a compelling interest in the health, education, and welfare of children as future citizens." Frazier v. Bailey, 957 F.2d 920, 930 (1st Cir. 1992) (footnote omitted).

It follows, as the Supreme Court has held, that a state may seek "to protect minor children through a judicial determination of their interests in a neglect proceeding." Stanley v. Illinois, 405 U.S. 645, 649 (1972).  Indeed, the Court has not seen fit, as a matter of constitutional law, even to "question the assertion that neglectful parents may be separated from their children." Id. at 652.  Generally, of course, "a deprivation of a fundamental right such as the custody of one's children must be

---

[20]In addition to the Fourteenth Amendment, the amended complaint invokes the Fourth, Fifth, and Seventh Amendments as sources of their rights to family integrity.  While, like the Fourteenth Amendment, the Fifth Amendment guarantees due process, it "applies only to actions of the federal government--not to those of state or local governments." Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 8 (1st Cir. 2007) (internal quotation marks omitted).  So it has no application here.  The plaintiffs' objection does not even mention, let alone develop, their novel notion that the Fourth and Seventh Amendments afford them rights to family integrity, so the court will ignore it.

preceded by notice and an opportunity to be heard." Tower v. Leslie-Brown, 326 F.3d 290, 298 (1st Cir. 2003).

The plaintiffs retained both physical and legal custody of Eleonora until after the Superior Court found that they had neglected her, see Part II.A.2.a.ii, supra, and, by way of the dispositional order, awarded custody of Eleonora to DCYF and ordered her placement at Crotched Mountain, see Part II.A.2.b, supra. That did not happen, moreover, until the plaintiffs received notice and the opportunity to be heard--not only at the dispositional hearing, which they attended in person, but also at the neglect hearing in the Family Court (Katz, but not Grodman, was also afforded a de novo neglect hearing in the Superior Court). See Part II.A.2, supra.

Given the well-established law, just discussed, that a state can separate a child from her neglectful parents upon notice and opportunity to be heard, no reasonable official would have thought he or she was violating the plaintiffs' constitutionally protected rights to family association or child rearing simply by participating in the neglect or dispositional proceedings that brought about that result. Nor do the plaintiffs allege that any of the defendants took any particular unconstitutional action during the course of those proceedings. While, as already noted, the plaintiffs complain that various aspects of the neglect

findings and dispositional orders themselves violated their
constitutional rights, the Rooker-Feldman doctrine prevents this
court from hearing that complaint.  See Part III.A.2, supra.

The plaintiffs also claim "a right to be free of
unreasonable, repetitive and duplicative state investigations
into abuse and/or neglect."  The court takes this to refer to the
plaintiffs' allegation that, prior to the neglect complaint that
ultimately led to their losing custody of Eleonora, DCYF
investigated three other complaints of neglect against them,
lodged by Lovett, and concluded that each was unfounded.  See
Part II.A.1.a, supra.  As the DCYF defendants point out, this
claim runs squarely into controlling law that "the state may
freely investigate allegations of child abuse," Hatch v. Dep't
for Children, Youth & Their Families, 274 F.3d 12, 20 (1st Cir.
2001), because "[t]he right to family integrity clearly does not
include a constitutional right to be free from child abuse
investigations," Watterson v. Page, 987 F.2d 1, 8 (1st Cir.
1993).  While, as one court has mused, this principle might yield
if "the investigation was undertaken in bad faith or with a
malicious motive or if tactics used to investigate would 'shock
the conscience,'" Kottmyer v. Maas, 436 F.3d 684, 691 n.1 (6th
Cir. 2006), that theory would not help the plaintiffs here
because (1) they have not identified any conscience-shocking

tactics, nor have they plausibly attributed any bad faith or malice to the investigations,[21] see Part III.B.2.a, supra, and (2) regardless, these investigations occurred wholly outside of the limitations period, see Part III.B.2.b, supra.

    **b.   Guardianship proceedings**

       **i.   Justification for proceedings**

The plaintiffs also complain about "objectively baseless guardianship proceedings," presumably, DCYF's series of petitions for guardianship of Eleonora.  See Part II.A.5, supra.  The plaintiffs do not identify, however, any clearly established constitutional right by parents to be free from state efforts to seek guardianship over their child, even if those efforts are "baseless."  To the extent that those efforts were unsuccessful (for example, the petition for guardianship that, the plaintiffs allege, DCYF dismissed in September 2008), it would seem that they did not affect any of the plaintiffs' constitutionally

---

    [21]To the contrary, the plaintiffs themselves say that these earlier investigations cleared them of any wrongdoing--which makes it implausible to claim that the investigations were carried out maliciously or in bad faith (at least in the absence of some conscience-shocking investigatory tactics and, again, none have been alleged).  See also note 13, supra.

protected interests at all.  The plaintiffs provide no authority
or developed argument to the contrary.[22]

To the extent that DCYF's petitions for guardianship over
Eleonora's person were granted, they gave DCYF, and removed from
the plaintiffs, "the powers and responsibilities of a parent
regarding [her] support, care and education," N.H. Rev. Stat.
Ann. § 463:12, I, including the power to "[g]ive any necessary
consent or approval to enable [her] to receive medical or other
professional care, counsel, treatment, or service," id. § 463:12,
III(d).  As just discussed, the Fourteenth Amendment protects
parents' rights to make decisions about their childrens' care,
but that right is qualified by the state's interest in
safeguarding children's health--a regime that, as the court of
appeals has observed, makes it "difficult, if not impossible, for
officials to know when they have violated clearly established
law."  Frazier, 957 F.2d at 931 (quotation marks omitted).

_____

[22]The same is true of the guardianship proceedings that DCYF
commenced in late May 2009, to take effect after Eleonora turned
18.  See Part II.A.5.c, supra.  The plaintiffs have identified,
and the court is aware of, no authority recognizing a parent's
constitutional right to make medical decisions for a child after
he or she reaches adulthood, even if (as was the case here) the
child is incapacitated from making those decisions on his or her
own.  So the plaintiffs cannot premise their substantive due
process claims on the adult guardianship proceedings.

Even if the guardianships violated the plaintiffs'
constitutional right to decide matters of Eleonora's care, then,
the defendants who participated in obtaining the guardianships
for DCYF are entitled to qualified immunity, because "the
contours of this right have yet to be clearly established." Id.
Indeed, one federal court of appeals recently ruled that state
child welfare officials had qualified immunity from claims that,
by obtaining guardianship over a child in order to obtain medical
treatment for him, they had violated his parents' due process
right to direct his care. PJ ex rel. Jensen v. Wagner, 603 F.3d
1182, 1197-98 (10th Cir. 2010). The court reasoned that, while
"precedent reasonably suggests that the Due Process Clause
provides some level of protection for parents' decisions
regarding their child's medical care," there was no "clearly
established constitutional line that defines what a state can and
cannot do to protect a child whose life is compromised by his
parents' refusal to obtain medical care." Id. at 1198. That
observation is equally apt here.

For example, in granting DCYF's petition for guardianship
over Eleonora until her eighteenth birthday, the Family Division
found (after a hearing attended by both of the plaintiffs) that,
beginning in February 2009, Eleonora had "developed symptoms of
paranoia, delusions, and self-harm" and that this "sharp and

significant decline in Eleonora's condition . . . combined with
the parent's refusal to allow Crotched Mountain to administer any
medical or health treatment requires appointment of a guardian."
In re Grodman, No. 2009-G-25, slip op. at 2.  Based on these
facts--which the plaintiffs are collaterally estopped from
relitigating here, see Part I, supra--the DCYF defendants did not
violate the plaintiffs' clearly established due process rights to
direct Eleonora's medical care by bringing the guardianship
proceedings.[23]  See PJ, 603 F.3d at 1198.

### ii.  Defendants' conduct during guardianship proceedings

Counts 5 and 6 of the amended complaint claim that the DCYF
defendants "interfered" with a variety of the plaintiffs' other
constitutional rights--including under the Fourth Amendment--by

---

[23]Similarly, the plaintiffs acknowledge in their amended
complaint that, in April 2008, "DCYF had to file for
guardianship" after Katz refused to comply with the provision of
the dispositional order that she sign releases giving DCYF access
to Eleonora's medical providers.  See Part II.A.5.a, supra.  The
dispositional order's grant of legal custody to DCYF, in fact,
gave it "[t]he responsibility to provide [her] with . . .
ordinary medical care provided that such rights and
responsibilities shall be exercised subject to the power, rights,
duties and responsibilities of [her] guardian." N.H. Rev. Stat.
Ann. § 169-C:3, XVII(d).  Under these circumstances, no
reasonable official would have known he was violating the
plaintiffs' clearly established constitutional right to make
medical decisions for Eleonora, as opposed to pursuing the
state's legitimate interest to ensure the health of its children,
by seeking to reposit that decisionmaking authority in DCYF by
way of the 2008 guardianship proceedings.

filing guardianship petitions which "either contained false information, or omitted material exculpatory information."[24]

Based on the Supreme Court's decision in Franks v. Delaware, 438 U.S. 154 (1978), the court of appeals has held that "[i]t has long been clearly established that the Fourth Amendment's warrant requirement is violated when a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in a warrant application if the false statement is necessary for a finding of probable cause." Aponte Matos v. Toledo Davila, 135 F.3d 182, 187 (1st Cir. 1998) (quotation marks omitted). Thus, "[a]n officer who obtains a warrant through material false statements which result in an unconstitutional search may be held personally liable for his actions under § 1983," id. (footnote omitted), as may an officer who knowingly withholds exculpatory evidence from another officer preparing an affidavit for an arrest warrant, Burke v. Town of Walpole, 405 F.3d 66, 87 (1st Cir. 2005).

---

[24]While the plaintiffs baldly assert that the June 2008 and April 2009 guardianship petitions included false statements, the amended complaint does not identify any (save for a statement in the June 2008 petition that arrest warrants had issued for the plaintiffs, which was in fact true, see Part II.A.4.b, supra). Instead, the amended complaint alleges a number of facts that the petitions omitted and that, in the plaintiff's view, were material to the guardianship question in a way helpful to them.

But the plaintiffs do not provide, and the court is not aware of, any authority applying these principles to a state child welfare official who intentionally or recklessly omits material facts from an affidavit in support of a guardianship petition.  This is unsurprising, because, as just noted, the rule announced in Franks is based on the Warrant Clause of the Fourth Amendment, see 438 U.S. at 164-165, and a guardianship petition does not itself result in the issuance of a warrant nor, for that matter, any "search" or "seizure."  Indeed, "while the reach of the Fourth Amendment has been extended to include various types of governmental conduct outside the traditionally recognized area of law enforcement, the [Supreme] Court has been careful to limit this expansion to governmental conduct that can reasonably be said to constitute a 'search' or a 'seizure' within the meaning of the Fourth Amendment."  United States v. Attson, 900 F.2d 1427, 1430 (9th Cir. 1990).  So the Fourth Amendment, and the interpretation the Court gave it in Franks, simply have no application to the guardianship proceedings at issue here.

This court's research has uncovered one case holding that, by deliberately including false statements in a declaration filed to terminate a plaintiff's guardianship over a minor child, a state child welfare official violates the plaintiff's substantive due process rights.  Costanich v. Dep't of Soc. & Health Servs.,

76

627 F.3d 1101, 1114 (9th Cir. 2010) (relying on Devereaux v. Abbey, 263 F.3d 1070 (9th Cir. 2001)).  Even assuming that this is correct, however (which this court need not and does not decide), it would not defeat the qualified immunity of the DCYF officials who submitted the guardianship petitions at issue here.

First, a single judicial decision recognizing a constitutional right does not "clearly establish" that right for purposes of qualified immunity, unless, of course, that decision is binding in the jurisdiction in question.  See al-Kidd, 131 S. Ct. at 2083-84 (holding that, "absent controlling authority[,] a robust consensus of cases of persuasive authority" is necessary to overcome qualified immunity).  Second, the Constanich court held that the constitutional right it recognized, i.e., "not to be accused based on deliberately falsified evidence during civil investigations which could result in the deprivation of protected liberty or property interests," was not "clearly established" by prior law.  Id. at 1114-16.  Constanich was decided in December 2010, after all of the complained-of conduct in this case occurred.  Thus, even assuming that the Constitution prevents public officials from making deliberately false statements in support of a guardianship proceeding, and assuming further that the plaintiffs have plausibly alleged that one or more defendants

77

did so here, but see note 24, supra, those defendants would still
be entitled to qualified immunity.

    The plaintiffs also complain about the ex parte nature of
the guardianship petitions filed in April 2008 and April 2009.[25]
See Part II.A.5.a-b, supra.  The court of appeals has held that
"the Constitution allows a case worker to take temporary custody
of a child, without a hearing, when the case worker has a
reasonable suspicion that child abuse has occurred (or,
alternatively that a threat of abuse is imminent)."  Hatch, 274
F.3d at 22 (emphasis added).  This rule also governs a "plausible
decision to remove a child" due to "neglect or an imminent
serious risk of . . . neglect."  Carter v. Lindgren, 502 F.3d 26,
32 (1st Cir. 2007).  It follows that the lesser ex parte
intrusion here--relieving the plaintiffs of their guardianship
rights over Eleonora, who was no longer in their custody at that
point--could not have violated their constitutional rights so
long as the defendants had a plausible reason for it.

_____

        [25]The plaintiffs allege that DCYF's May 2009 petition,
seeking guardianship over her after she turned 18, was also filed
ex parte.  It was not.  See Part II.A.5.b, supra.  While the
petition was granted ex parte, that cannot support any claim by
the plaintiffs here because (1) any attack on the nature of the
guardianship proceedings, as opposed to a defendant's conduct
during those proceedings, is barred by the Rooker-Feldman
doctrine, see Part III.A.2, supra, and (2) the plaintiffs have
not shown any constitutionally protected interest in Eleonora's
guardianship after she became an adult, see note 22, supra.

They did, as the plaintiffs more or less concede as to the April 2008 petition, see note 23, supra, and as the Family Division found after conducting the subsequent hearing, which the plaintiffs attended, on the April 2009 petition, see Part III.C.1.b.i, supra.  The defendants who sought that ex parte guardianship have qualified immunity from any constitutional liability for doing so.

2.  **Plaintiffs' arrests and incarceration**

    a.  **Appropriate defendants**

In counts 9-12 of the amended complaint, the plaintiffs claim false arrest and false imprisonment in violation of their federal constitutional rights by all of the DCYF defendants, all of the Rockingham defendants, and Danville and Parsons.[26]  As an initial matter (with two exceptions) the amended complaint does not link any of the defendants to the plaintiffs' arrests, which occurred in Massachusetts and, presumably, were carried out by law enforcement officers in that state.  Indeed, the amended

---

[26]These claims, like many of the plaintiffs' other constitutional claims, invoke the Fourth, Fifth, and Fourteenth Amendments.  As already noted, the Fifth Amendment has no application here, see note 20, supra, and, absent "selective enforcement of the law based on considerations such as race" (which is one of the few things not claimed here) the Fourth Amendment, not the Fourteenth, governs the constitutional legitimacy of a seizure by law enforcement, Whren v. United States, 517 U.S. 806, 813 (1996).

complaint does not even identify, by name, agency, or otherwise, the law enforcement officers who arrested either of the plaintiffs.  Nor (again, with two exceptions) does the amended complaint allege that any of the defendants played any role in the defendants' detention following their arrests.

"It is well-established that only those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable under" § 1983.  Velez-Rivera v. Agosto-Alicea, 437 F.3d 145, 156 (1st Cir. 2006).  Aside from Parsons and Nye (who, the plaintiffs say, prepared criminal complaints against them, see Part II.A.4.b, supra), the amended complaint does not allege that any of the named defendants participated in the arrests.[27]  Aside from Parsons and Nye, then, the plaintiffs have stated no § 1983 claim against any defendant arising out of the arrests, regardless of their legality.  Similarly, aside from Nye and Champion (both of whom, the plaintiffs allege, "requested" that Katz spend 90 days in jail, see id.), the plaintiffs have stated no § 1983 claim against any defendant

---

[27]The plaintiffs state that "[i]t was the DCYF defendants who conspired to initiate the criminal complaints against the plaintiffs for interference with custody."  Again, though, the plaintiffs have not plausibly alleged any conspiracy between the DCYF employees and the law enforcement officials named as defendants to deprive the plaintiffs of any federally secured rights, including to be free from arrest without probable cause. See Part III.B.2, supra.

arising out of their detention, again, regardless of its
legality.  So counts 9-10, claiming false arrest, are dismissed
against all defendants besides Parsons and Nye, and counts 11-12,
claiming false imprisonment, are dismissed against all defendants
besides Nye and Champion.

**b.   Plaintiffs' arrests**

Even though Parsons and Nye did not actually arrest the
plaintiffs, those officers could be liable under § 1983 on the
theory that they "caused the plaintiffs to be unconstitutionally
arrested by presenting a judge with a complaint and a supporting
affidavit which failed to establish probable cause." Malley v.
Briggs, 475 U.S. 335, 337 (1986).  They are entitled to qualified
immunity on such a claim, however, unless "a reasonably well-
trained officer in [their] position would have known that [their]
affidavit failed to establish probable cause." Id. at 345.
Here, the affidavit that Parsons submitted in support of the
arrest warrants for the plaintiffs readily establishes probable
cause for their arrest for interference with custody.[28]

---

[28]Only Parsons applied for the arrest warrants that issued
from the Plaistow District Court; Nye's name does not appear
anywhere on the warrant application.  Nevertheless, the court has
accepted as true the plaintiffs' allegation that Nye was involved
in preparing the application.

Under New Hampshire law, a person is guilty of felony interference with custody

> if such person knowingly takes from this state or entices away from this state any child under the age of 18, or causes any such child to be taken from this state or enticed away from this state, with the intent to detain or conceal such child from a parent, guardian or other person having lawful parental rights and responsibilities as described in [N.H. Rev. Stat. Ann. §] 461-A.

N.H. Rev. Stat. Ann. § 633:4, I.  In relevant part, Parsons's affidavit states that (a) on November 30, 2007, the Superior Court issued an order granting legal custody of Eleonora to DCYF, (b) to take her into custody on behalf of DCYF, Parsons and McVeigh visited the plaintiffs' home on December 3, 2007, where they told Katz about the custody award, and she responded that Eleonora "was out of the area," (c) on December 5, 2007, Parsons returned to the plaintiffs' home to take Eleonora into custody on behalf of DCYF, and provided Grodman with a copy of the custody order, but Grodman said that Eleonora was "with Mrs. Katz out of the area," and (d) on March 24, 2008, an attorney who appeared for the plaintiffs in the Superior Court filed a motion stating that they had "removed [Eleonora] from the State of New Hampshire because they fear that [she] is in mortal danger if she is again in the custody of the State."

These allegations amply show probable cause that the
plaintiffs knowingly took Eleonora from the state with the intent
to detain or conceal her from a "person having lawful parental
rights and responsibilities," i.e., DCYF.  Indeed, the motion
that the plaintiffs' then-counsel filed in the Superior Court
essentially admits as much.  The plaintiffs nevertheless advance
two theories as to why Parsons lacked probable cause to apply for
the warrants.  Both are manifestly incorrect.

First, the plaintiffs rely on the fact that, while the
Superior Court's dispositional order awarded DCYF custody of
Eleonora and directed her placement at Crotched Mountain, the
order did not give DCYF guardianship over Eleonora.  They argue
that, as a result, Parsons "knew, or should have known, that the
plaintiffs could not be charged with interference with custody,
when DCYF had no right to physical custody without co-temporal
guardianship."  In granting "full legal custody" to DCYF,
however, the dispositional order itself gave DCYF the right to
physical custody.  Under New Hampshire law, "'[l]egal custody
means a status created by court order embodying [certain] rights
and responsibilities," including, specifically, "[t]he right to
have the physical possession of the child."  N.H. Rev. Stat. Ann.
§ 169-C:3, XVII(b).  So the fact that DCYF lacked guardianship of
Eleonora at the time Parsons applied for the arrest warrants had

83

no effect on DCYF's right to physical custody of Eleonora and, consequently, no bearing on the existence of probable cause to arrest the plaintiffs for interfering with that right.

Second, the plaintiffs argue that Parsons lacked any "basis to believe that [Eleonora] had been brought back into New Hampshire" after the Superior Court granted custody of her to DCYF.  To the contrary, the plaintiffs allege, Eleonora "had moved to Massachusetts in early November 2007," before the Superior Court's order awarding custody of her to DCYF.  But even assuming this is true, the plaintiffs do not allege that they told it to Parsons, or anyone else involved in attempting to secure custody of Eleonora for DCYF, at any time before he filed the application for the arrest warrants.

To the contrary, what the plaintiffs had offered at that point by way of explanation for Eleonora's absence was their lawyer's statement that they had "removed [her] from the State of New Hampshire because they fear that [she] is in mortal danger if she is again in the custody of the State."  Again, this essentially admits a violation of § 633:4, I.[29]  Whatever else

---

[29]It appears that the plaintiffs' counsel's statement was an effort to invoke a statutory affirmative defense to an interference with custody charge, i.e., "that the person so charged was acting in good faith to protect the child from real and imminent physical danger."  N.H. Rev. Stat. Ann. § 633:4, III.  This defense, however, "shall not be available if the person charged has left the state with the child," id. § 633:4,

can be said of it, then, the plaintiffs' allegation that Eleonora had moved to Massachusetts before the custody order issued does nothing to plausibly suggest that a reasonable officer in Parsons's position would have known that his affidavit failed to establish probable cause to arrest the plaintiffs for interference with custody.  Again, what Parsons knew was that the plaintiffs' lawyer had told the Superior Court that they had intentionally taken Eleonora from the state so that DCYF could not secure custody of her.

The plaintiffs also argue that their arrests were illegal because "there were no criminal charges pending against either plaintiff" on the dates of their arrests, since, they say, no complaint or other formal charging document was filed until afterwards.  But this notion finds no support in any Fourth Amendment jurisprudence and, indeed, reflects a fundamental misunderstanding of criminal procedure.  As the Supreme Court has held, "what the Constitution requires" for a valid arrest is "a warrant from a judicial officer 'upon probable cause, supported by Oath or affirmation.'"  United States v. Ventresca, 380 U.S.

_____

IV, and, in any event, "the Supreme Court has flatly rejected the idea that the police have a duty to investigate potential defenses before finding probable cause."  Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004) (citing Baker v. McCollan, 443 U.S. 137, 145-46 (1979)).

85

102, 112 (1965) (quoting U.S. Const. amend. IV).  It does not require the filing of a charging instrument prior to the arrest.

Finally, the plaintiffs argue at length that Parsons and Nye acted in "bad faith" in procuring the warrant.[30]  But this allegation, even if true, does nothing to diminish the existence of probable cause to arrest the plaintiffs for interference with custody.  "[T]he Supreme Court has repeatedly held that 'subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'"  United States v. Fernandez, 600 F.3d 56, 62 (1st Cir. 2010) (quoting Whren, 517 U.S. at 813 (bracketing by the court omitted)).  In other words, "an officer's motive" for an arrest, even if illegitimate, cannot "'invalidate objectively justifiable behavior under the Fourth Amendment.'"  Id. at 62 n.6 (quoting Whren, 517 U.S. at 812) (bracketing omitted).  Parsons and Nye are entitled to qualified immunity for the plaintiffs' Fourth Amendment claims insofar as they arise out of the issuance of the warrant.

---

[30]As support for this argument, the plaintiffs rely heavily on their accusation that, in procuring Katz's arrest and extradition, Parsons and Nye "misrepresented" that a criminal warrant had issued for her arrest.  Again, a warrant for Katz's arrest issued from the Plaistow District Court on May 30, 2008.

**c.  Plaintiffs' detention**

Because, as just discussed, there was probable cause to arrest the plaintiffs, there was also probable cause to detain them following their arrests.  The plaintiffs do not question Grodman's detention on any other basis.  While the plaintiffs complain about aspects of Katz's detention, those complaints are without merit, at least insofar as they are directed at the defendants named in this lawsuit.

The plaintiffs' chief complaint is about the length of Katz's detention following her arrest.  They allege that she was held without bail in Massachusetts for some 90 days "on the request of" Nye and Champion.  The plaintiffs also allege that, following Katz's arraignment, Nye "inquired about [her] immigration status, causing ICE to place an immigration hold on her without bail" and, furthermore, that Nye "continued to use the false immigration detainer without bail to deny [Katz] release from custody . . . even after [she] was granted bail," resulting in her spending an additional 40 days in jail in New Hampshire after her extradition.

As this court has observed, "our constitutional system places responsibility for releasing a detainee on the judicial system, rather than on law enforcement officers who have accomplished the detention."  Holder v. Town of Newtown, 638 F.

87

Supp. 2d 150, 155 (D.N.H. 2009) (citing Baker v. McCollan, 443
U.S. 137, 146 (1979) and Brady v. Dill, 187 F.3d 104, 111-14 (1st
Cir. 1999)).  So does the law of New Hampshire (which gives the
authority to issue bail orders to a bail commissioner, before the
detainee's arraignment, N.H. Rev. Stat. Ann. § 597:18, and
afterwards to a court, id. § 597:2) and Massachusetts (which is
similar, see Mass. Gen. Laws ch. 276, § 58).  The plaintiffs'
complaints about Katz's detention without bail, then, would
appear to be misdirected.

     Although the court of appeals has held that a police officer
who "help[ed] to shape, and exercis[ed] significant influence
over, the bail decision" can be liable under § 1983 for excessive
bail that results, Wagenmann v. Adams, 829 F.2d 196, 212 (1st
Cir. 1987), that holding does not support the plaintiffs' claims
against Nye and Champion here, for at least three reasons.
First, as this court has explained, "Wagenmann was a case of
action that resulted in a clear violation of the Eight Amendment
right against excessive bail," Holder v. Town of Newton, 2010 DNH
019, 31, aff'd without opinion, No. 10-1227 (1st Cir. Sept. 2,
2010), rather than a denial of bail.  This is a key distinction
because, while "[t]he Eight Amendment prohibits 'excessive bail,'
the Constitution 'says nothing about whether bail shall be

available at all.'" Id. at 27 (quoting United States v. Salerno, 481 U.S. 752-53 (1987) (further citation omitted)).

Second, in further contrast to Wagenmann, the plaintiffs do not allege facts supporting a plausible inference that Nye or Champion "helped to shape" or "exercised significant influence" over the decisions to deny bail to Katz. Indeed, the plaintiffs do not claim that Nye (or Champion) had any role in ICE's alleged issuance of an "immigration hold" on Katz, other than to "inquire" as to her immigration status. Even as to the decision to deny bail to Katz in Massachusetts, the amended complaint says merely that Nye and Champion "requested" that outcome; the defendant officer in Wagenmann went further, "describ[ing] the nature of the various charges, the amount of money on [the plaintiff's] person, and the like" to the bail commissioner. 829 F.2d at 211-12. The plaintiffs here do not allege that Nye or Champion did anything of the sort.

Third, the plaintiffs do not suggest that either decision to deny bail to Katz was mistaken. Unlike in Wagenmann, where there was "no legitimate reason to think [the detainee] . . . might flee," id. at 213, Katz had been arrested for fleeing the state with Eleonora in order to thwart DCYF's custody rights.

Given the significant differences between the facts alleged here and those found in Wagenmann, then, that case hardly serves

89

as "reasonable notice that the specific conduct [Nye and Champion are] alleged to have committed . . . is unlawful." Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 66 (1st Cir. 2004).  Nor, so far as the court's research reveals, does any other controlling caselaw, or "robust consensus of cases of persuasive authority." al-Kidd, 131 S. Ct. at 2083-84.  Accordingly, even if Nye or Champion violated some right Katz has under the Constitution by "requesting" her detention without bail or "inquiring about [her] immigration status" (an issue which the court need not and does not decide), they are entitled to qualified immunity from any claim based on that violation.[31]

D.  **Remaining claims**

The plaintiffs' remaining claims (1) challenge other actions that law enforcement officers took against the plaintiffs as violations of their constitutional rights or (2) assert state-law

---

[31]This conclusion applies with equal force to any claims that, following Katz's arrest, Nye (a) "requested a no contact order" preventing contact between her and Grodman while Katz was jailed and (b) "called the Social Security Administration and ensured that the Grodmans' Social Security retirement payments were stopped."  Like the decisions to deny bail to Katz, the decisions to prevent contact between the plaintiffs while she was detained, and to stop Grodman's social security payments, were not made by Nye, nor does the amended complaint alleged facts (as opposed to conclusions) plausibly showing that Nye "helped to shape" or "exercised significant influence" over those decisions.

tort theories.  For the reasons discussed below, the defendants are entitled to dismissal of those claims as well.

1.   **Other law enforcement conduct**

   a.   **Interference with effective assistance of counsel**

Count 17 of the amended complaint claims that all of the Rockingham County defendants "interfered with [Katz's] right to effective assistance of counsel by speaking [with her] attorney to undermine [her] representation in a criminal matter."  This appears to refer to the plaintiffs' allegations that Nye attended Katz's arraignment in Massachusetts "just in case [she] tried lying to the judge" and, while there, "inappropriately spoke to [Katz's] defense counsel," telling counsel that "all of [Katz's] addresses come back to U.P.S. stores so [Nye] knew that everything [Katz] was telling [counsel] was lies."

Among other problems with this claim, "'ineffective assistance' is not a ground of civil damages liability" against law enforcement officers on the theory that their actions "deprived [a plaintiff] of effective assistance of counsel" during criminal proceedings.  Sutton v. Kooistra, 202 F.3d 275 (table), 1999 WL 993734, at *2 (7th Cir. Oct. 26, 1999) (unpublished opinion).  Instead, "ineffective assistance" is a ground for collateral relief from a criminal conviction or

damages against counsel on a legal malpractice claim, id., which are not among the relief sought here.  Count 17 is dismissed.

### b.   Traffic stop

The plaintiffs complain that, based on Parsons's issuance of a "['Be on the Lookout'] to Massachusetts police requesting the arrest of plaintiffs," they were subjected "to a traffic stop/arrest" in that state even though "Parsons admittedly had no legal authority to issue the ['Be on the Lookout'] to stop the plaintiffs in another state, much less detain and question them." But the plaintiffs do not identify any limits on the authority of a police officer in one state to ask police officers in another state to make an arrest, at least where (as here) the arrest is supported by probable cause.

Indeed, courts have consistently held, at least since the Supreme Court's decision in Virginia v. Moore, 553 U.S. 164, 175 (2008), that the Fourth Amendment does not even incorporate state-law limits on a police officer's authority to personally make a cross-border arrest.  See, e.g., United States v. Sed, 601 F.3d 224, 228 (3d Cir. 2010); United States v. Goings, 573 F.3d 1141, 1143 (11th Cir. 2009); United States v. Gonzales, 535 F.3d 1174, 1181-83 (10th Cir. 2008); Rose v. City of Mulberry, 533 F.3d 678, 680 (8th Cir. 2008); cf. Santoni v. Potter, 369 F.3d 594, 598-99 (1st Cir. 2004) (expressing no opinion on that issue

pre-Moore).  So, even if Parsons's issuance of the alert to
Massachusetts authorities amounted to a request to arrest the
plaintiffs if they were found there, that would not implicate the
Fourth Amendment.  Insofar as any of the plaintiffs' Fourth
Amendment claims are based on the traffic stop, then, those
claims are dismissed.

###### c.   **Warrantless entry into Stuart Grodman's apartment**

The plaintiffs also complain that McVeigh, accompanied by
the three Boston police officers named as defendants here, made a
warrantless entry into Stuart Grodman's apartment in East Boston.
See Part II.A.3.a, supra.  This claim did not appear in the
plaintiffs' initial complaint in this action, which did not name
Stuart Grodman as a plaintiff, nor any Boston police officer as a
defendant.  The plaintiffs' initial complaint, in fact, did not
so much as hint at any entry into Stuart Grodman's apartment or,
for that matter, any illegal entry by anyone into any place.

Rather, the plaintiffs' claim of a warrantless entry into
Stuart Grodman's apartment first appeared in the plaintiffs'
first amended complaint, which they sought leave to file on March
3, 2011.  As the defendants point out, this was more than three
years after the warrantless search allegedly occurred, on January
16, 2008.  The defendants therefore argue that any Fourth

Amendment claim arising out of the illegal entry is barred by the three-year statute of limitations.  See Part III.A.2.b, supra.

In trying to escape this conclusion, the plaintiffs argue that the first amended complaint relates back to the date they filed their original complaint--which was September 17, 2010, less than three years after the alleged warrantless entry.  Rule 15(c) of the Federal Rules of Civil Procedure provides that "[a]n amendment to a pleading relates back to the date of the original pleading when," in relevant part, "the amendment asserts a claim that arises out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

The plaintiffs do not explain how the warrantless entry claim satisfies this standard.  Again, the original complaint says nothing about any warrantless entry whatsoever, either by making such a claim or setting forth any factual allegations as to the January 2008 incident.  To the contrary, the amended complaint describes a course of law enforcement conduct that begins with Parsons's actions to try to apprehend the plaintiffs in May 2008, which was several months after the alleged warrantless entry into Stuart Grodman's apartment, and did not even involve any of the same law enforcement personnel.

94

The Supreme Court has held that an amendment does not relate back under the "conduct, transaction, or occurrence" standard of Rule 15(c) "when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." Mayle v. Felix, 545 U.S. 644, 650 (2005). That is precisely what the first amended complaint does as to the claim that McVeigh and the Boston Police officers wrongfully entered Stuart Grodman's apartment.  So that claim does not relate back to the date of the original complaint, with the result that it is barred by the statute of limitations.  Insofar as the plaintiffs' Fourth Amendment claims (including the invasion of privacy claim, see Part III.B.7, supra) are based on the warrantless entry, they are dismissed as time-barred.

**2.   State-law claims**

    **a.   Negligence and "social worker malpractice"**

Count 28 of the amended complaint charges the DCYF defendants with negligence for "failing to use reasonable care in their interactions with the plaintiffs."  But the amended complaint does not allege any "interactions" between the plaintiffs and any of the DCYF defendants aside from McVeigh,[32]

---

[32]If by "interactions," the plaintiffs mean the DCYF defendants' conduct during the neglect, custody, and guardianship proceedings, that cannot serve as the basis of a negligence claim.  As the plaintiffs expressly acknowledge in their

and its accounts of those interactions do not plausibly state any
negligence on his part.  Furthermore, the plaintiffs themselves
allege that their interactions with McVeigh ended in November
2007, which was prior to the start of the three-year limitations
period.  See Part III.A.2.b, supra.  Count 28 is dismissed.

Count 29 of the amended complaint, entitled "social worker
malpractice," claims that DCYF "owed the [plaintiffs] a duty of
care to provide them with competent services" and "to take all
appropriate actions to protect [Eleonora] from all danger [while]
she remained in state custody."  Among other problems, this claim
seeks money damages against a state agency, so it is barred by
the Eleventh Amendment.  See Will v. Mich. Dep't of State Police,
491 U.S. 58, 71 (1989).  Count 29 is also dismissed.

### b. Defamation

Count 31 of the amended complaint alleges that all of the
defendants "caused the publication of false, misleading and
untrue information about the plaintiffs, including that [they]

---

objection, the DCYF employee who brought and conducted all of
those proceedings on its behalf, Matel, "is entitled to
prosecutorial immunity from money damages in his role as an
advocate."  The DCYF employees who provided testimony during
those proceedings are likewise immune from suit for that conduct.
See Provencher v. Buzzell-Plourde Assocs., 142 N.H. 848, 853
(1998) (holding that "[s]tatements made in the course of judicial
proceedings constitute one class of communications that is
privileged from liability in civil actions," subject to an
exception inapplicable here).

were mentally ill, were sexual perverts, and/or were abusive and

neglectful toward their blood relatives."  This echoes an

allegation in the body of the amended complaint that "[a]fter

[the plaintiffs] removed Eleonora from the public school system,

the defendants continued to smear [the plaintiffs] calling them

mentally ill, obstructionist and hostile, among other things."

Taken alone, these allegations are merely "[s]ubjective

characterizations or conclusory descriptions of a general

scenario which . . . will not defeat a motion to dismiss."

Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)

(quotation marks and bracketing omitted).

The balance of the amended complaint nowhere alleges that

the vast majority of the defendants made any statements about the

plaintiffs at all.[33]  Likewise, the plaintiffs' objection to the

motions to dismiss does not address the defamation claim against

any defendant aside from Lovett (and agrees to dismiss the

---

[33]The amended complaint alleges that various DCYF defendants
made false statements about the plaintiffs during the course of
the guardianship proceedings but, as just noted, those
statements are absolutely privileged under New Hampshire law.
See note 32, supra.  As also noted several times already, while
the amended complaint claims that Nye and Parsons falsely stated,
after May 30, 2008, that warrants had issued for the plaintiffs'
arrests, those statements were in fact true, as were alleged
statements by Nye and Champion that there were immigration
"proceedings" against Katz following her arrest, see Part
II.A.4.b, supra.  Aside from these statements, and those
attributed to Lovett, discussed infra this part, the court cannot
locate any other false statements in the amended complaint.

defamation claim against two of the defendants, Roy and Katragadda).  As to Lovett, the plaintiffs argue that she "made 10's [*sic*] of baseless allegations of abuse and/or neglect which she knew, or should have known, were unfounded."

The only "unfounded" abuse or neglect allegations alleged in the amended complaint, however, were Lovett's complaints to DCYF prior to its institution of the neglect proceedings against the plaintiffs in April 2006.  As already discussed, Lovett made those complaints more than three years before the plaintiffs commenced this action, so any claim based on them is barred by the statute of limitations, <u>see</u> Part II.B.2.b, <u>supra</u> (which is three years for actions for slander and libel, N.H. Rev. Stat. Ann. § 508:4, II).  As is the case with the retaliation claim, then, the amended complaint does not even arguably state a plausible defamation claim against any defendant besides Lovett and Timberlane, but the claim against them is time-barred.  Count 31 is dismissed.

### c.   Intentional infliction of emotional distress

Count 26 of the amended complaint claims that all of the defendants intentionally inflicted emotional distress on the plaintiffs through "actions and/or inactions which, because of their grossly illegal and unconstitutional nature, were so outrageous that . . . [they] would have caused any reasonable

person . . . severe emotional distress."  As the disposition of
all of the plaintiffs' other claims makes clear, however, they
have not alleged any "grossly illegal or unconstitutional
behavior" on the part of any defendant.  At the absolute worst,
the plaintiffs have alleged a few instances of conduct that were
arguably unconstitutional (a point as to which, again, this court
expresses no view), but not "grossly" so.  To state a claim for
intentional infliction of emotional distress, "it is not enough
that [the defendant] 'has acted with an intent which is tortious
or even criminal,'" nor, for that matter, "'that his conduct has
been characterized by malice.'"  Mikell v. Sch. Admin. Unit No.
33, 158 N.H. 723, 728-29 (2009) (quoting Restatement (Second) of
Torts § 46 cmt. *d* (1965)).  Count 26 is dismissed.

### d.  Exemplary damages

Finally, count 27 seeks exemplary damages against all of the
defendants.  Because all of the plaintiffs' state-law claims have
been dismissed, though, they cannot recover any form of damages,
exemplary or otherwise, so count 27 must be dismissed as well.
See Meyer v. Callahan, 2010 DNH 199, 1 n.1.

**IV.   <u>Conclusion</u>**

For the foregoing reasons, the defendants' motions to dismiss[34] and for judgment on the pleadings[34] are GRANTED.  As noted above, the plaintiffs have twice moved for leave to amend their complaint yet again.  <u>See</u> Fed. R. Civ. P. 15(a)(2).  These motions, however, do not seek to amplify any of the plaintiffs' factual allegations, but to add claims for (A) malicious prosecution, (B) abuse of process, and (C) violation of Katz's equal protection rights under the Fifth Amendment, as well as (D) a request for a permanent injunction.[35]  <u>See</u> Part II.B.2, <u>supra</u>.  Those claims are futile because (A) there was probable cause to charge the plaintiffs with interference with custody, <u>see</u> Part III.C.2.b, (B) the proposed amendment does not plausibly allege that any criminal process was used against the plaintiffs "primarily to accomplish a purpose for which it was not designed," Restatement (Second) of Torts § 682 & cmt. *b* (1965), (C) the Fifth Amendment does not apply to the actions of state, county, or local governments, <u>see</u> note 20, <u>supra</u>, and (D) the

---

[34]Document nos. 108, 112, 114, 116, 119, 121-123.

[34]Document nos. 110, 117.

[35]The proposed amendment also seeks to add Eleonora as a plaintiff.  But the plaintiffs cannot bring claims on Eleonora's behalf in a pro se capacity.  <u>See</u> Part III.A.1, <u>supra</u>.

plaintiffs have not plausibly alleged any likelihood of future harm, see Part III.A.3, supra.

The plaintiffs' motions for leave to amend[36] are therefore DENIED because the proposed amendments are futile.  See Hatch, 274 F.3d at 19.  The second motion to amend is also denied for the independent reason that it was brought with undue--and unexplained--delay, more than two years after the action was commenced and more than 19 months after the first amended complaint was filed.  See Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 538 (1st Cir. 2011).  The plaintiffs' first amended complaint is DISMISSED.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 16, 2013

cc:  Elena Katz, pro se
     Arnold Grodman, pro se
     Stuart Grodman, pro se
     Rebecca L. Woodard, Esq.
     Nancy J. Smith, Esq.
     Brian J.S. Cullen, Esq.
     Adam B. Pignatelli, Esq.
     Michael A. Pignatelli, Esq.

---

[36]Document nos. 152, 195.

Donald L. Smith, Esq.
Paul B. Kleinman, Esq.
Charles P. Bauer, Esq.
Corey M. Belobrow, Esq.
W. Daniel Deane, Esq.
Biron L. Bedard, Esq.
Julie Ciollo, Esq.
Michelle Hinkley, Esq.
Raquel J. Webster, Esq.